Stephen W. GRANDSTAFF, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8128.

Court of Appeals of Alaska.

Nov. 30, 2007.

---

**18.** *Crawford,* 100 P.3d at 450.

Michael Cohn, Anchorage, for the Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Thomas V. Van Flein, Clapp, Peterson & Stowers, LLC, Anchorage, for Amicus Curiae Alaska Dental Society.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

### OPINION

STEWART, Judge.

Stephen A. Grandstaff was convicted of misconduct arising from his medical practice in Fairbanks. The State charged that Grandstaff manipulated vulnerable, drug-addicted patients to obtain sex from the patients in exchange for drugs or drug prescriptions. At trial, the jury found Grandstaff guilty of sexually assaulting patients, issuing prescriptions that had no medical purpose to those patients, and stealing Medicaid funds.

Grandstaff raises several challenges to his convictions and his sentence. We conclude that none of the issues raised in this appeal warrants reversing any of his convictions. We also reject Grandstaff's attacks on his sentence. Therefore, we affirm the superior court's judgment.

### Background facts and proceedings

The State's case focused on four women who were Grandstaff's patients, S.Y., S.P., C.R., and E.S. In 1995, S.Y. sought treatment from Grandstaff for depression, anxiety, and endometriosis. S.Y. testified to a history of drug addiction, and indicated that her beginning efforts at drug treatment started in 1995 or 1996. Other doctors had previously prescribed pain pills for her, but they stopped due to her drug-seeking behavior; S.Y.'s medical records at Grandstaff's clinic, Tanana Valley Clinic, contained entries from other practitioners that indicated she was not to be given any more narcotics. Nevertheless, Grandstaff prescribed narcotic pain pills for her.

At first, S.Y. scheduled appointments with Grandstaff about once a month, but her appointments increased to once a week, and she went in for more pills every few days. As the frequency of her visits and prescriptions increased through the summer and fall of 1997, the tenor of her relationship with Grandstaff changed. Grandstaff's jokes became more sexual in nature, and S.Y.'s appointments began to include pelvic examinations. S.Y. testified that there was rarely a nurse in the room during those examinations, and that she did not have to express a medical need to get more pills. Throughout this period, her drug use increased.

On a visit in September 1997, Grandstaff examined S.Y.'s collarbone after a minor auto accident in which she had not been injured. Grandstaff moved one hand inside her shirt and touched her breast, and placed his other hand between her legs. He told her that "you know what I want, I know what you want, and I can't be giving you these pills for nothing." S.Y. left the clinic without getting any pills. Later that day, Grandstaff called S.Y. at her parents' house, asked how she was doing, and told her he had something for her. He came by soon after with a bottle of Percocet, a narcotic analgesic. After S.Y. took some of the pills, they went upstairs and had sex. S.Y. testified that the only reason she had sex with Grandstaff was to get the pills.

S.Y. continued to see Grandstaff because no other doctor would prescribe enough pills to satisfy her. S.Y. testified that she told Grandstaff more than once that she did not want to have sex anymore. She also told him that she wanted to enter drug treatment, but he did nothing to help her. S.Y. testified that during this period she was "really messed up in the head," and she was miserable.

On December 12, 1997, S.Y. arranged to meet Grandstaff at the Westmark Hotel across the street from his clinic. S.Y. testified that she did not want to have sex with Grandstaff anymore, so she asked a friend to drop by the hotel room while Grandstaff was there to scare him so that he would leave before they had sex, but after he had given her drugs. According to S.Y., Grandstaff arrived and looked around the room, then

left and returned soon after with a bottle of Stadol and four Mepergan pills, both narcotic analgesics. S.Y. took most of the Stadol and all of the Mepergan, which made her "really fogged." She left to look for her friend, then returned to the room, where she and Grandstaff kissed "a little bit" before S.Y. passed out. When S.Y. woke up, she was naked and Grandstaff was having sex with her.

S.Y.'s mother testified that when S.Y. called home that night, her speech was slurred and incoherent. S.Y.'s mother also testified that Grandstaff called the next day, asked how S.Y. was doing, and then hung up.

According to S.Y.'s mother, Grandstaff frequently called S.Y. at her home. In April 1997, S.Y.'s mother asked Grandstaff whether they could plan an intervention or otherwise get help for S.Y. Grandstaff replied that he knew what he was doing and that S.Y. was an adult. On another occasion, when S.Y.'s mother challenged Grandstaff about the amount of drugs he was prescribing for S.Y., Grandstaff told her that she needed to back off and take care of her other children and her granddaughter (S.Y.'s daughter).

In late 1997 or early 1998, S.Y. overdosed and was hospitalized at Fairbanks Memorial Hospital (FMH). She was treated by Dr. Schultz, a psychiatrist, and she talked with him about her relationship with Grandstaff.

In March 1998, when S.Y. was living at the North Star Center in Fairbanks, she failed a drug test administered by the facility and later spoke with the police.

In August 1998, S.Y. was interviewed by Sergeant James Geier of the Fairbanks Police Department, who later became the chief investigating officer in the case against Grandstaff. Sergeant Geier obtained a *Glass* warrant[1] in February 1999 and recorded two conversations between S.Y. and Grandstaff. In the second conversation, Grandstaff and S.Y. talked in person and Grandstaff claimed that he did not know she was an addict. He also stated that he "never consciously did any of those things that you're thinking of, any of those things you think I did." When S.Y.

asked whether he had been "unconscious," Grandstaff answered, "No, but I think, you know, that we do things subconsciously without realizing what we're doing." S.Y. testified that during this conversation, Grandstaff leaned into the vehicle and touched her on her breasts and between her legs.

S.P. became a patient of Grandstaff's in the fall of 1996, after the doctor she had been seeing left the clinic. S.P. had been hospitalized for pneumonia, and she was also being treated for anxiety and depression. S.P. testified that before Grandstaff treated her, she had had problems with alcohol and had used methamphetamine and marijuana. S.P. discussed her drug and alcohol problems with Grandstaff.

S.P. testified that her initial appointments with Grandstaff seemed to be normal doctor-patient contacts. However, in October or November of 1996, during her third or fourth appointment, while Grandstaff was listening with a stethoscope on S.P.'s back, he pushed up her bra, fondled and sucked her breasts, and licked her neck and mouth. S.P. asked Grandstaff to stop. Grandstaff told her she needed to relax. In later visits, Grandstaff placed his fingers in S.P.'s vagina, made S.P. massage his penis and testicles until he ejaculated, and made S.P. perform fellatio on Grandstaff.

Grandstaff and S.P. started having sexual intercourse in November or December of 1996. After each visit, Grandstaff prescribed drugs for S.P. or gave her samples. S.P. would massage Grandstaff's penis while he wrote the prescription. S.P. testified that she could just walk into Grandstaff's office without an appointment, and that the amount of drugs he gave her increased after they started having sex. Though the drugs made her feel "like a zombie," S.P. continued seeing Grandstaff because she wanted the drugs. S.P. testified that Grandstaff wore tight underwear, similar to racquetball or bicycle shorts.

S.P. testified that in 1998, around the time of her birthday, she was sexually assaulted

---

1. *See State v. Glass,* 583 P.2d 872, 881 (Alaska 1978), *on reh'g,* 596 P.2d 10 (Alaska 1979) (holding that the Alaska Constitution requires police

to obtain judicial authorization before secretly recording a person's private conversations).

by her neighbor. She was upset on her next appointment with Grandstaff, and when she told him why, he told her she would feel better if she massaged his penis. During another appointment, Grandstaff entered the exam room quietly, signaled S.P. not to talk, and handed her a note on a napkin. According to S.P., the note said that if she said anything to anyone, he would "deny it because he's a doctor and I'm the patient," and "[h]e's got his career ahead of him." After she read the note, Grandstaff rinsed the note in the sink and threw it away, and S.P. left without getting any drugs. The last time S.P. went to see Grandstaff at the clinic, she was told he was not there due to a family emergency.

In 1998 or 1999, after S.Y. recorded the two conversations with Grandstaff, S.Y. approached S.P. at a Taco Bell because she recognized her from the pharmacy at the clinic building. S.Y. told S.P. that she was a patient of Grandstaff's, and asked S.P. if anything had happened with Grandstaff. S.P. told S.Y. that she obtained drugs by having sex with Grandstaff.

In March 1999, S.P. spoke with Sergeant Geier, who applied for another *Glass* warrant. The recording of the conversation between S.P. and Grandstaff failed due to a malfunction of the recording equipment, but Sergeant Geier testified that he heard Grandstaff tell S.P. she did not have to talk to the police, but could speak with his attorney if she needed any advice. At some point, S.P. also told Dr. Schultz, the psychiatrist, about her involvement with Grandstaff.

C.R. was clean and sober in January 1997 when she was released from prison after 3 1/2 years in custody. Soon after her release, she started seeing Grandstaff for a condition that caused a weakening of the muscles on her left side. She told Grandstaff about her criminal history and her history of drug addiction and prostitution. C.R. became addicted to the drugs Grandstaff prescribed for her.

C.R. testified that when Grandstaff wrote her prescriptions, she sat in his lap, played with his hair, and rubbed his back and leg. Grandstaff "would get that prescription for me quick because he knew that's what I wanted.... He knew what I was coming for was my script." C.R. sold some of the drugs she got from Grandstaff, and testified that she continued to see him because she was an addict and she had no trouble getting drugs from him. C.R. was hospitalized after an overdose in September 1998. When she went to see Grandstaff after the overdose, he told her she could not have any more drugs.

E.S. was a patient of Grandstaff's from September 1995 through August 1998. E.S. died of a drug overdose in December 1999. Her medical records revealed several serious medical problems, as well as a long history of alcohol and drug abuse, heroin addiction, and drug-seeking behavior.

The grand jury returned a 105–count indictment charging Grandstaff with one count of first-degree sexual assault,[2] two counts of second-degree sexual assault,[3] four counts of second-degree theft,[4] fifty-five counts of second-degree misconduct involving a controlled substance,[5] and forty-three counts of fourth-degree misconduct involving a controlled substance.[6]

The first-degree sexual assault charge stemmed from the incident involving S.Y. at the Westmark Hotel (Count 26). The two second-degree sexual assault charges were for the first incidents of nonconsensual sexual contact with S.Y. (Count 25) and S.P. (Count 68), respectively. The four theft charges were based on the total amounts that Medicaid paid for illegitimate medical services and prescriptions for each of the four women. Each drug count corresponded with a specific prescription for a Schedule IA drug (second-degree misconduct involving a controlled substance) or a Schedule IVA drug (fourth-degree misconduct involving a controlled substance) prescribed or supplied for a non-medical purpose.

2. AS 11.41.410(a)(1).

3. AS 11.41.420(a)(1).

4. AS 11.46.130(a)(1).

5. AS 11.71.020(a) and AS 17.30.080.

6. AS 11.71.040(a)(1) and AS 17.30.080.

Grandstaff filed numerous motions before and during trial, asking the court to dismiss the indictment, to sever the sexual assault counts from the drug and theft counts, and to suppress various evidence, including some material Grandstaff argued was privileged. He also moved to suppress the conversations recorded pursuant to the *Glass* warrants. These motions were generally denied. Grandstaff challenges many of these rulings on appeal.

The trial jury convicted Grandstaff of the first-degree sexual assault of S.Y. (Count 26), and of the second-degree sexual assault of S.P. (Count 68); the jury acquitted Grandstaff of the second-degree sexual assault of S.Y. (Count 25). The jury also convicted Grandstaff of the three second-degree theft charges related to S.Y., S.P., and C.R., and acquitted him of the theft charge related to E.S. Grandstaff was convicted of thirty-two counts of second-degree and thirty-six counts of fourth-degree misconduct involving a controlled substance, for prescriptions issued to S.Y., S.P., and C.R. He was acquitted of six of the drug counts related to S.P., one of the drug counts related to C.R., and all of the counts related to E.S.

Grandstaff subsequently filed a motion to set aside the judgment, arguing that the drug counts in the indictment were fatally defective. This motion was denied.

During sentencing, the State presented two other women who testified that Grandstaff sexually molested them while they were his patients.

Superior Court Judge Ralph R. Beistline imposed a composite term of 34 years with 15 years suspended, for 19 years to serve. Grandstaff appeals.

### Discussion

#### Grandstaff's motion to dismiss the indictment

■ Grandstaff argues that there are several reasons why Judge Beistline should have granted his motion to dismiss the indictment.

■ First, Grandstaff claims that the State failed to present exculpatory evidence to the grand jury as required by *Frink v. State*.[7] Exculpatory evidence for purposes of *Frink* is "evidence that tends, in and of itself, to negate the defendant's guilt."[8]

Grandstaff claims that the prosecutor should have informed the grand jury of several matters. First, Grandstaff argues that the grand jury should have known that someone on behalf of the prosecution promised C.R. that she would not be prosecuted for selling some of the drugs Grandstaff prescribed for her, that C.R. told a police officer that she wanted money before cooperating, and that C.R. told a police officer that she had not been totally truthful about her relationship with Grandstaff. Although evidence of each of these circumstances provides potentially useful evidence for impeachment, none of those circumstances provides evidence that tends to negate Grandstaff's guilt.

■ Grandstaff also argues that the prosecutor should have informed the grand jury that S.Y. cooperated with the police in other investigations and that S.Y. received the benefit of the State's dismissal of a petition to revoke her probation. But Grandstaff did not rely on this claim in the superior court. Therefore, this claim is waived. Even if it was not waived, evidence of S.Y.'s cooperation with the police and any benefit she received is not the type of evidence that tends to negate Grandstaff's guilt.

Grandstaff also argues that the prosecutor improperly prevented S.Y. from responding to a question whether Grandstaff enjoyed having sex with her when she was unconscious. Grandstaff claims this evidence is exculpatory because it would undermine S.Y.'s testimony that she did not consent to the sexual activity in the hotel near Grandstaff's office. But Grandstaff did not raise this claim in the superior court, so it is also waived.

Next, Grandstaff argues that the prosecutor presented perjured testimony when S.Y. testified at the grand jury that she did not want to have sex with Grandstaff at the

---

7. 597 P.2d 154, 164–66 (Alaska 1979).

8. *State v. McDonald*, 872 P.2d 627, 639 (Alaska App.1994).

hotel. But Grandstaff did not raise this claim in the superior court. And Grandstaff interprets the record in the light most favorable to this claim. S.Y. testified at the grand jury and at trial that she in fact did not want to have sex with Grandstaff even though she hoped to lure him to the hotel with an expectation of sex. She planned to get the drugs from Grandstaff and then have her friend drop in and scare Grandstaff away before she had to engage in sex. But she lost consciousness after ingesting the drugs Grandstaff brought to the hotel. When she regained consciousness, she found that Grandstaff was engaged in sexual intercourse with her. Even if Grandstaff had preserved this claim, we do not read the record as establishing perjury by S.Y.

Next, Grandstaff claims Count 68 of the indictment should have been dismissed. Count 68 charged Grandstaff with second-degree sexual assault with S.P. "between the approximate dates of October 31, 1996 and March 31, 1997." In the superior court, Grandstaff argued that the evidence did not establish which of the incidents of sexual contact described by S.P. was charged in Count 68. But a fair review of the testimony establishes that S.P. was referring to the first time Grandstaff fondled her. Judge Beistline properly concluded that the evidence presented supported that count.

██ Finally, Grandstaff argues that Judge Beistline should have dismissed the indictment because the State presented, to the grand jury, a report prepared by Dr. Theodore Parran, an associate clinical professor at Case Western Reserve University School of Medicine in Cleveland. The State hired Dr. Parran to review the treatment Grandstaff provided to S.Y., S.P., C.R., and E.S. and determine if there appeared to be a medical purpose for the treatment he provided and the drugs he prescribed or delivered to each. Dr. Parran prepared a report of his findings and the State presented the report as an exhibit before the grand jury. A witness

read Dr. Parran's findings and conclusions. The prosecutor informed the grand jury that Dr. Parran was standing by to testify telephonically from Ohio if the grand jury had questions. The grand jury elected not to hear from Dr. Parran.

Grandstaff argues that the report was inadmissible hearsay. But Alaska Rule of Criminal Procedure 6(r)(1) provides in relevant part that "[i]n appropriate cases, . . . witnesses may be presented to summarize admissible evidence if the admissible evidence will be available at trial." And the Alaska Supreme Court stated in *Taggard v. State*[9] that "[t]he need to use a summary of available evidence may arise in cases involving voluminous records."[10]

We conclude that Grandstaff's case is such a case. The medical records for each patient and the prescriptions that supported the numerous drug charges were voluminous. In *State v. Gieffels*,[11] the supreme court considered what establishes compelling justification for the use of hearsay and stated that "where a professional submits a technical report and his testimony would simply affirm that report, it is proper to introduce the evidence by hearsay testimony since the presumed inconvenience is a compelling reason for such evidence."[12] Dr. Parran was available if the grand jury had any questions for him and ultimately he did testify at trial. (Grandstaff also argues that Dr. Parran's report was based on privileged information and documents. We address and reject those claims below.)

██ Grandstaff also points out that Dr. Parran's opinion was phrased in terms of a "reasonable degree of medical certainty." Grandstaff argues that this standard is insufficient because it is not proof beyond a reasonable doubt. But evidence supporting an indictment must establish a probability of guilt, not proof of guilt beyond a reasonable doubt.[13] Dr. Parran's conclusion in his report that the prescriptions issued by Grand-

**9.** 500 P.2d 238 (Alaska 1972).

**10.** *Id.* at 242 n. 14 (citation omitted).

**11.** 554 P.2d 460 (Alaska 1976).

**12.** *Id.* at 465 n. 22.

**13.** *See Sheldon v. State,* 796 P.2d 831, 836–37 (Alaska App.1990).

staff lacked a legitimate medical purpose was sufficient to support the indictment under this standard.

Grandstaff also complains that Dr. Parran's report did not address each count of misconduct involving a controlled substance individually, and that the report contained inflammatory statements not within his realm of expertise. Grandstaff waived these attacks on the indictment because he did not raise them in the superior court.[14]

Finally, Grandstaff claims that there was insufficient time for the grand jury to consider each count of the indictment individually. The record shows that the grand jury considered the 105–count indictment for forty-three minutes before returning a true bill. The record shows that the foreperson of the grand jury indicated that the grand jury had considered each count independently. Standing alone, this record is not sufficient to establish misconduct on the part of the grand jury. Grandstaff has not overcome the presumption of regularity that attaches to a court proceeding.[15]

We conclude that Judge Beistline did not abuse his discretion when he rejected Grandstaff's claims and declined to dismiss the indictment.[16]

*Grandstaff's motion to sever the sexual assault charges*

Before trial, Grandstaff moved to sever the three sexual assault charges from the other drug-related charges. Judge Beistline denied the motion. Properly joined offenses may be severed if trying the charges together would unduly prejudice the defendant.[17] We overturn the denial of a motion to sever only if the defendant shows both an abuse of discretion and actual prejudice.[18]

Grandstaff argues that he was prejudiced in two ways. First, he contends that the large amount of evidence related to the drug and theft charges constituted character evidence that would induce the jury to convict him on the allegedly weaker sexual assault charges because they would consider him a "bad man." Second, Grandstaff argues that he should have been allowed to take the stand to explain the drug charges without exposing himself to cross-examination on the sexual assault charges.

Grandstaff's first claim is without merit. As the State points out, the factual background of all the charges was intertwined and could not be explained in a vacuum. Evidence that Grandstaff prescribed large amounts of drugs to S.Y. and S.R. would be admissible in a trial on the sexual assault charges to show that Grandstaff prescribed the drugs to gain sexual access to those patients. If evidence of the drug-related offenses would be admissible in a trial for the sexual assault charges, "the defendant is hard-pressed to show actual prejudice from the failure to sever, since the evidence would have been admitted even if the judge had granted separate trials." [19]

In his second argument, Grandstaff contends that trying the charges together violated his constitutional right to remain silent, forcing him to face cross-examination on the sexual assault charges should he choose to testify regarding the drug-related charges. Grandstaff relies on *Cross v. United States*,[20] which stands for the proposition that forcing a defendant to choose between testimony on one count and silence on another constitutes prejudice.[21]

But in a line of cases beginning with *Cleveland v. State*,[22] the Alaska courts have ruled that in order to rely on this argument, a defendant must make "a convincing showing

14. *See Gaona v. State*, 630 P.2d 534, 537 (Alaska App.1981).

15. *See Jerrel v. State*, 851 P.2d 1365, 1372 (Alaska App.1993).

16. *See Sheldon*, 796 P.2d at 834.

17. *Pease v. State*, 54 P.3d 316, 322 (Alaska App. 2002).

18. *Id.*

19. *Id.*

20. 335 F.2d 987 (1964).

21. *Id.* at 989.

22. 538 P.2d 1006 (Alaska 1975).

that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other."[23] This means the defendant must specifically identify what he plans to testify about on the one count, and what dangers lie in testifying on the other.[24] The trial court found that Grandstaff had important testimony to give on the drug charges, but that he was less than clear about the dangers inherent in testifying about the sexual assault charges. Grandstaff is no more specific here. Without an explicit showing of prejudice, Grandstaff is not entitled to severance.[25] Therefore, we conclude that Judge Beistline did not abuse his discretion in denying the motion to sever.

### The evidence seized under the Glass warrant was admissible

■■■■ Grandstaff moved to suppress the conversations between Grandstaff and S.Y. that were recorded under the Glass warrants. Grandstaff argued that because S.Y. acted as a police agent, her promises to drop civil charges if he spoke with her were impermissible inducements. Grandstaff argued that because of this purported inducement, his statements were involuntary. Judge Beistline denied Grandstaff's motion to suppress, finding that because Grandstaff was not in custody, was not restrained, was not forced to speak with S.Y., and was able to cut off the conversation at any time, his statements were voluntary.

On appeal, Grandstaff renews his objection to the admission of the recorded conversations, arguing that the police, through S.Y., violated his rights to counsel and to remain silent.

During the recorded conversations, Grandstaff told S.Y. repeatedly that he could not talk to her because his lawyer had advised him not to. He contends that the conversation should have ceased as soon as he invoked his rights to counsel and to silence.

Grandstaff argues that he invoked his right to counsel when he told S.Y. that his lawyer advised him not to talk to her. Grandstaff also argues that because the police knew he had counsel for a potential civil suit, it was inappropriate for them to contact him in the course of their criminal investigation. Grandstaff does not specify which right to counsel his argument concerns. He did not yet have a Sixth Amendment right to counsel, because the case was in its investigatory stage—the right to counsel had not attached because Grandstaff had not been formally charged with any crime.[26] This is true even though the police knew Grandstaff had a lawyer.[27]

Grandstaff asserts that S.Y. blocked his exit from the parking lot in order to speak with him. He does not point to any facts in the record to support this contention, though Grandstaff did state on the tape, "Can I pull out?"[28] If Grandstaff is suggesting that his Fifth Amendment right to counsel was violated, this argument also fails. Grandstaff does not challenge Judge Beistline's findings that Grandstaff was not in custody, was not restrained, was not forced to speak with S.Y., and was able to cut off the conversation at any time. Grandstaff does not otherwise argue that he was in custody.[29]

Grandstaff also argues that he invoked his right to silence by repeatedly telling S.Y. that he could not talk to her. Yet Grandstaff

23. *Nell v. State*, 642 P.2d 1361, 1364 (Alaska App.1982).

24. *Id.*

25. *See id.* at 1365.

26. *See Carr v. State*, 840 P.2d 1000, 1005 (Alaska App.1992); *Thiel v. State*, 762 P.2d 478, 482–83 (Alaska App.1988), *abrogated on other grounds by Matthew v. State*, 152 P.3d 469 (Alaska App. 2007).

27. *See Thiel*, 762 P.2d at 482–83.

28. Sergeant Geier testified on cross-examination that during the first, eight-minute conversation, S.Y.'s car was parked behind Grandstaff's car, but he could not see whether or not she was blocking him in. Grandstaff's assertion that S.Y. blocked him in seems to refer to this conversation and not to the second, forty-three minute conversation, recorded later on the same day.

29. *See Collier v. Anchorage*, 138 P.3d 719, 720 (Alaska App.2006) ("The right to counsel under the Fifth Amendment only arises during custodial interrogation.").

did not walk away, and continued to speak to S.Y.

Grandstaff contends that S.Y. induced Grandstaff to speak by promising to drop civil charges against him, and by threatening to commit suicide if he did not talk to her. Grandstaff asserts that under Alaska law, statements acquired by improper inducements and threats are inadmissible. Grandstaff cites *Beavers v. State*[30] and two other cases [31] in which confessions were ruled involuntary after police promised leniency or threatened harsher treatment. The Alaska Supreme Court stated in *Beavers* that "[t]hreat-induced confessions should be considered presumptively involuntary absent evidence affirmatively indicating that the suspect's will was not overcome by the threats."[32]

Even assuming S.Y. was a police agent, there is no merit to Grandstaff's claim that his statements to S.Y. were involuntary. We addressed a similar claim in an unpublished case, *Tso v. State*.[33] Tso was the suspect in a murder investigation, and the police obtained a *Glass* warrant to record conversations between Tso and an acquaintance named John Monroe.[34] Tso moved to suppress the conversations recorded under the *Glass* warrant, arguing that his incriminating statements were involuntary because Monroe had "continually badgered" him to talk about the homicides and had disparaged the Public Defender Agency, which was representing Tso, as part of a psychological campaign to get Tso to talk.[35] We rejected Tso's claim:

> During his conversations with Monroe, Tso was not in custody and he did not know he was speaking to a police agent. Thus, from Tso's perspective, Monroe's attempts to engage Tso in conversation about the homicides and Monroe's negative comments concerning the Public Defender

Agency did not bear an official imprimatur. We recognize that a defendant's statements can be involuntary if they are elicited by coercive actions on the part of an informant secretly working for the police. However, Monroe did not threaten Tso to make him confess, nor did Monroe promise Tso immunity or leniency for confessing. Monroe and Tso did engage in a fist fight during this period of time, but there is no indication that this altercation was related to Monroe's attempts to obtain information from Tso.

While Tso did make several incriminating statements during his series of conversations with Monroe, Tso generally displayed reticence when speaking about the homicides. There is no evidence that Tso's will was overborne by Monroe or that Monroe threatened or promised anything that would make an innocent person confess to committing homicide.[36]

Similarly, Grandstaff made some incriminating statements during his two conversations with S.Y., but there is no evidence that he made these statements because his will was overborne. It is true that S.Y. said she wanted to drop her civil suit and that she was suicidal. But she never offered to drop her civil suit in exchange for an admission by Grandstaff; nor did she threaten to commit suicide if he did not make an admission. Indeed, Grandstaff has not identified any specific inculpatory statements he claims were induced by S.Y.'s alleged promises and threats.

Grandstaff's claim finds little support in *Beavers*. In *Beavers*, the defendant confessed in detail to his participation in a robbery after a trooper told him he would "get hammered" if he lied about his involvement in the crime.[37] Beavers was a sixteen-year-old boy

---

30. 998 P.2d 1040 (Alaska 2000).

31. *See S.B. v. State,* 614 P.2d 786 (Alaska 1980); *Smith v. State,* 787 P.2d 1038 (Alaska App.1990).

32. *Beavers,* 998 P.2d at 1048.

33. Alaska App. Memorandum Opinion and Judgment No. 2938 (June 29, 1994), 1994 WL 16196195.

34. *Id.* at 2, 1994 WL 16196195 at *1.

35. *Id.* at 12–13, 1994 WL 16196195 at *5.

36. *Id.* at 13, 1994 WL 16196195 at *5–6 (internal citations omitted).

37. *Beavers,* 998 P.2d at 1042.

who was interrogated by a trooper in a patrol car.[38] Grandstaff's conversations with S.Y., a former patient and admitted drug addict, had none of the indicia of a coercive police interrogation. Although there is some evidence that S.Y. was blocking Grandstaff's truck when she first contacted him, this did not prevent Grandstaff from voluntarily ending the contact. During the second recorded conversation, Grandstaff repeatedly refused S.Y.'s invitations to sit in her car; and he could have walked away at any time.

Moreover, the record contains affirmative indications that S.Y.'s threats and entreaties were ineffective.[39] When S.Y. told Grandstaff she was suicidal, and that she might lose her child because of her drug use, Grandstaff simply recommended that she go to the hospital and reassured her that everything would work out. Although S.Y.'s offers to drop her civil case may have prompted Grandstaff to tell S.Y. he cared about her and that he had not been involved with other women, he consistently denied knowing she was an addict when he prescribed drugs to her. Viewed as a whole, the conversations show that Grandstaff's will was not overborne and that his statements to S.Y. were voluntary.

Grandstaff also suggests that the conversations infringed on his right to privacy. Grandstaff maintains that suppression issues require courts to balance the societal interest in using reliable evidence against criminals with the societal interest in protecting citizens' privacy.[40] Grandstaff does not explain his privacy argument further, so we conclude that it is waived for inadequate briefing.[41]

Because Grandstaff had no right to counsel to invoke, and because S.Y.'s statements were not coercive police activity that would render a statement involuntary, Judge Beistline properly denied Grandstaff's motion to suppress the recorded conversations with S.Y.

*The privilege claims*

Grandstaff argues that the superior court improperly admitted evidence that was protected by privilege.

Grandstaff raised these claims in a motion to suppress filed after the State filed a motion in limine. The State's motion in limine sought rulings on the admissibility of several admissions by Grandstaff relating to his sexual conduct. The State's motion grouped Grandstaff's admissions into eight different categories: admissions to personnel at his clinic; admissions to hospital personnel during their review of his hospital practice privileges that were memorialized in records prepared by hospital personnel; admissions contained in medical records from Abbott Memorial Hospital in Minneapolis, Minnesota, and the Sante Center for Healing in Argyle, Texas (facilities where Grandstaff sought professional help for his behavior), and admissions contained in the agreement to limit his hospital privileges; admissions in Grandstaff's personal diary that he prepared while in treatment; admissions in his medical license renewal application; verbal admissions during an interview with a Division of Occupational Licensing (DOL) investigator; admissions during an examination of Grandstaff by Dr. Irwin Dreiblatt contained in a report by Dreiblatt to the State Medical Board; and admissions contained in Grandstaff's agreement to surrender his medical license.

In Grandstaff's motion to suppress, he asked the court to exclude almost all of the State's identified evidence as well as additional items, and he requested an evidentiary hearing on the motion.

In a written decision, Judge Beistline ruled on the admissibility of the evidence described in the motions and denied the request for an evidentiary hearing. Judge Beistline ruled that Grandstaff's admissions that were memorialized in documents were admissible, with the exception of Grandstaff's personal

---

**38.** *Id.* at 1041.

**39.** *See id.* at 1046.

**40.** *See State v. Malkin,* 722 P.2d 943, 947 (Alaska 1986).

**41.** *Katmailand, Inc. v. Lake and Peninsula Borough,* 904 P.2d 397, 402 n. 7 (Alaska 1995); *Petersen v. Mutual Life Ins. Co. of New York,* 803 P.2d 406, 410 (Alaska 1990); *Wren v. State,* 577 P.2d 235, 237 n. 2 (Alaska 1978).

diary and disclosures to his clinic that were not prepared for business purposes. A few days later, Judge Beistline issued an order containing further analysis of his decision. Below, we discuss the issues raised by Grandstaff regarding Judge Beistline's ruling.

### Dr. Dreiblatt's testimony

First, Grandstaff argues that Dr. Dreiblatt's testimony should have been excluded. Grandstaff was examined by Dr. Dreiblatt after the DOL learned that Grandstaff's affiliation with his clinic had been terminated and that Grandstaff's privileges at the Fairbanks Memorial Hospital had been limited. Also, Dr. Schultz contacted the DOL after S.Y. and S.P. told him about Grandstaff's conduct. Coincidentally, around this time, Grandstaff submitted an application to the DOL to renew his medical license because it was up for renewal.

In the renewal application, Grandstaff stated that he had been evaluated for "disorders" for which he had received two months of treatment. Grandstaff provided the DOL with a release that authorized the DOL to examine "all records that pertain to credentialing records and actions at facilities at which I have applied for or held privileges to practice medicine," and to provide copies of those records "to the [DOL] and/or its investigators, and/or representatives of the Office of the Attorney General of the State of Alaska."

Later that month, a DOL investigator interviewed Grandstaff, who was accompanied by his attorney. Grandstaff admitted having sexual relations with S.Y. at his office, at her home, and at a hotel near his office. He also admitted that he had sexual relations with S.P. at his office.

The State Medical Board asked Grandstaff to be evaluated by Dr. Dreiblatt; Dreiblatt is a forensic psychologist who concentrates on issues involving doctors who engage in sexual conduct with their patients. Grandstaff submitted to a three-day evaluation by Dr. Dreiblatt.

Before the evaluation, Grandstaff provided a release that authorized Dr. Dreiblatt to report his findings to the DOL and the State Medical Board.

At trial, Dr. Dreiblatt testified that Grandstaff admitted being sexually involved with both S.Y. and S.P. and admitted prescribing large amounts of drugs to them, despite their long-term drug dependence problems. Grandstaff reported that he had sexual fantasies not only about S.Y. and S.P., but also other female patients.

Dr. Dreiblatt concluded that Grandstaff used drugs to bait S.Y. and S.P. and to reward them for having sex with him. According to Dr. Dreiblatt, Grandstaff admitted that he chose vulnerable, unhealthy addicts in order to transform the doctor-patient relationship into a sexual relationship.

Grandstaff argues that Dr. Dreiblatt's testimony is inadmissible on two grounds. Grandstaff first claims that Dr. Dreiblatt's evaluation is covered by the patient-psychotherapist privilege in Alaska Rule of Evidence 504(b). Evidence Rule 504(b) defines the privilege as follows:

> General Rule of Privilege. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the patient's physical, mental[,] or emotional conditions ... between or among the patient, the patient's physician or psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

The rule applies to "confidential communications" within the group designated in the rule. Evidence Rule 504(a)(4) defines "confidential communication":

> A communication is confidential if not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician

or psychotherapist, including members of the patient's family.

In *Plate v. State*,[42] we considered whether a communication was a confidential communication for purposes of the privilege in Evidence Rule 506, which addresses communications with members of the clergy.[43] We observed that the definition of a confidential communication in Rule 506 tracks the definition for the psychotherapist-patient privilege and the lawyer-client privilege.[44] We announced a four-part test that a person claiming that a communication with a clergyman was confidential must prove: first, that the communicant subjectively believed that the conversation was private; second, that this belief was reasonable under the circumstances; third, that he intended that the communication not be disclosed to anyone else; and fourth, that he reasonably believed that the clergyman shared this intention.[45] We used this same test when we considered the application of the psychotherapist-patient privilege in *Ramsey v. State*.[46]

Before Grandstaff met Dr. Dreiblatt, Dreiblatt wrote Grandstaff a letter that confirmed that Grandstaff would have to sign a release so that Dreiblatt could report to the State Medical Board. When Dr. Dreiblatt began the interview with Grandstaff, Dreiblatt told Grandstaff that anything they discussed "could be and would likely be included in the report that went to the Medical Board." Grandstaff executed the release that authorized Dr. Dreiblatt to report to the State Medical Board. Applying the test from *Plate* and *Ramsey*, it is clear that a reasonable person in Grandstaff's position would not believe that the contents of his conversation with Dr. Dreiblatt would be confidential. Thus, we reject Grandstaff's claim that his communications with Dr. Dreiblatt were covered by the psychotherapist-patient privilege established in Evidence Rule 504(b).

Next, Grandstaff argues that the admission of Dr. Dreiblatt's testimony violated his constitutional right against self-incrimination. Grandstaff contends that because he risked losing his medical license if he did not cooperate with Dr. Dreiblatt, the admission of his statements during the evaluation was akin to compelled self-incrimination. But there is no indication that Grandstaff would automatically lose his license or that the Medical Board would impose any other penalty based on the mere fact that he asserted his privilege against self-incrimination. Therefore, the interview did not infringe on Grandstaff's privilege against self-incrimination.[47]

The State contends that Grandstaff did not preserve this argument in the superior court. The State's point is well-taken. Grandstaff mentions Dr. Dreiblatt's report as an adjunct to his claim that his statements to a DOL investigator "were not voluntary." A trial judge considering a voluntariness question must consider several factual issues, including the mental state of the defendant, to determine if the defendant waived his Fifth Amendment rights.[48] Grandstaff did not sufficiently alert the superior court that it needed to resolve these issues to rule on his claim.

Even if Dr. Dreiblatt was an agent of the State for purposes of deciding whether the Fifth Amendment applied, our own review of the record to evaluate Grandstaff's mental state and its legal significance reveals that nothing about Grandstaff's evaluation by Dr. Dreiblatt supports an involuntariness claim.

*The psychotherapist-patient privilege as applied to records memorializing the treatment Grandstaff received*

Next, Grandstaff argues that the records of his evaluation and treatment at Abbott Northwestern Hospital and the Sante Center for Healing were covered by the psychotherapist-patient privilege. After Grandstaff's clinic learned of his misconduct,

42. 925 P.2d 1057 (Alaska App.1996).

43. *Id.* at 1064–66.

44. *Id.* at 1065.

45. *Id.* at 1066.

46. 56 P.3d 675, 680 (Alaska App.2002).

47. *See State v. Rivers*, 146 P.3d 999, 1002–03 (Alaska App.2006).

48. *See Beavers*, 998 P.2d at 1044.

Grandstaff was placed on medical leave. Thereafter, Grandstaff was evaluated at Abbott Northwestern Hospital. After the evaluation, Grandstaff enrolled in the Sante Center where he stayed from June through August of 1998. Grandstaff listed both programs as facilities where he sought treatment for his "disorders."

The DOL asked Grandstaff for a release to review his treatment records. Grandstaff provided the release. Because Grandstaff's release operates as a waiver of the psychotherapist-patient privilege under Evidence Rule 504(b), we reject Grandstaff's privilege claim.

Grandstaff also claims that the records are confidential under 42 CFR Part 2. But the release Grandstaff signed recognized that portion of the Code of Federal Regulations and waived his rights under that regulation.

Finally, Grandstaff argues that even if the records were admissible, they should have been excluded because, under Evidence Rule 403, the probative value of the evidence was outweighed by the danger of unfair prejudice. Grandstaff does not explain why this evidence should have been excluded beyond stating that the evidence was inflammatory and had marginal probative value. Judge Beistline discussed this balancing test when he ruled on Grandstaff's privilege claims, and declined to exclude the records of Grandstaff's treatment. Grandstaff has not convinced us that Judge Beistline's ruling was an abuse of discretion.

*The court did not err by admitting statements Grandstaff made during a peer review investigation of his conduct*

■ Medical "peer review" refers to the process hospitals use to oversee medical staff to improve patient care, reduce hospital liability, and lower rates for malpractice insurance. In this case, the trial court admitted inculpatory statements Grandstaff made during a peer review investigation of his conduct. Grandstaff claims these admissions were privileged under the statute governing the confidentiality of peer review records.

Alaska Statute 18.23.030(a) provides, in pertinent part, that "all data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and may not be disclosed to anyone except to the extent necessary to carry out the purposes of the review organization and is not subject to subpoena or discovery." A violation is punishable as a misdemeanor.[49]

The issue in this case is the scope of the privilege created by this statute—in particular whether the privilege applies in all cases, both civil and criminal, or only in civil cases. The conventional justification for this privilege is that "protecting doctors from testifying against their colleagues promotes candor during peer review proceedings."[50] Such candor, at least in theory, leads to more rigorous oversight of patient medical care and lower malpractice premiums.

The privilege applies to all data and information *acquired* by a peer review organization in the exercise of its duties—which would include statements made by a doctor under investigation, as well as statements by medical staff providing evidence. The privilege does not reach any information, documents, or records that are independently available from third parties. These materials "are not immune from discovery or use in a civil action merely because they were presented during proceedings of a review organization."[51] Moreover, a member of a peer review committee, or a person who testified before the committee, cannot be prevented from testifying in a civil action about matters within their knowledge—though they cannot be asked about what they said to the peer review committee, or about the opinions they

**49.** AS 18.23.040.

**50.** B. Abbott Goldberg, *The Peer Review Privilege: A Law in Search of a Valid Policy,* 10 Am.J.L. & Med. 151, 154 (1984). *See also* Susan O. Scheutzow & Sylvia Lynn Gillis, *Confidentiality and Privilege of Peer Review Information: More Imagined Than Real,* 7 J.L. & Health 169, 182 (1992–93) (accord); *People v. Superior Court (Memorial Medical Center of Long Beach),* 234 Cal.App.3d 363, 286 Cal.Rptr. 478, 483 (1991) (noting that California's peer review privilege "is an attempt to prevent a chilling effect on the accurate evaluation of health care facilities which would lead to a decline in the quality of health care").

**51.** AS 18.23.030(a).

formed as a result of their participation in peer review proceedings.[52] In other words, the statute shields the proceedings and files of peer review committees from subpoena or discovery, but the information may be obtained independently from third parties.

Thus, if this were a civil case, the answer would be clear: Grandstaff could be called as a witness in that civil case, and he could be asked the same questions he was asked during peer review. But any statements he previously made to the review committee would be privileged, and he could not be asked to disclose what he said to the committee.

Alaska courts have not addressed whether this privilege extends to criminal cases. But the language and history of AS 18.23.030(a) suggest that the privilege is limited to civil actions.

Read in isolation, the first sentence of AS 18.23.030(a) is very broad, and there is nothing to suggest that it is limited to civil cases: "Except as provided in (b) of this section, all data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and may not be disclosed to anyone except to the extent necessary to carry out the purposes of the review organization and is not subject to subpoena or discovery."

■ But AS 18.23.030(a) only makes sense as a whole if a narrow construction is put on the first sentence. The parts of a statute should be construed together so as to produce a harmonious whole.[53] If the first sentence of AS 18.23.030(a) is interpreted broadly to mean that all information acquired in a peer review investigation is privileged in both civil or criminal actions, the exception in the third sentence of subsection (a) would be incongruous. That exception provides that any information, documents, or records that are "otherwise available from original

sources are not immune from discovery or use in a civil action merely because they were presented during proceedings of a review organization." If the peer review privilege extended to civil and criminal actions, but this exception applied only to civil actions, then information otherwise available from original sources—for instance, medical records provided to the peer review committee—would be immune from discovery in criminal cases but not in civil cases.

Although the pertinent legislative history is limited, it also supports the conclusion that the peer review privilege in AS 18.23.030 is limited to civil actions. Alaska Statute 18.23.030 was enacted in 1976 as part of a larger bill that addressed the issue of rising medical malpractice insurance rates.[54] There does not appear to be any contemporaneous legislative history addressing whether the privilege in AS 18.23.030(a) applies to criminal actions. However, AS 18.23.030 was amended in 1987 when the legislature passed a bill to strengthen the State Medical Board's ability to "detect and weed out incompetent and impaired" medical practice.[55] That bill, House Bill 70, amended AS 08.64.336 to tighten the statutory duty of hospitals to report a doctor to the State Medical Board when they take action to revoke or restrict the doctor's hospital privileges (or when the doctor resigns to avoid such action).[56] During discussion of House Bill 70, State Medical Board Chair Thomas L. Conley told the House Judiciary Committee that some members of the Medical Board were concerned that imposing this stricter reporting requirement on hospitals would chill the peer review function:

> The Board is split on this.... The worry among certain people is that the quality review and peer review functions of the hospitals may suffer some problems by requiring reports ... and there's a feeling among some Board members that it would chill things to the point that no one would

---

**52.** *Id.*

**53.** 2A Norman J. Singer, *Statutes and Statutory Construction* § 46:05, at 154 (6th ed.2000).

**54.** *See* H.B. 574 (1976).

**55.** Memo from Thomas L. Conley, Chair of the State Medical Board, to Representative John

Sund, sponsor of H.B. 70, on proposed revisions to AS 08.64 (dated December 3, 1986) (contained in House Judiciary Committee file on H.B. 70).

**56.** Ch. 87, § 16, SLA 1987; *see also* ch. 48, § 16, SLA 1983.

be willing to participate in any kind of quality review or peer review for fear that the records would wind up being subpoenaed. As things now stand [under AS 18.23.030(a)] those ... [peer review] organizations now have confidentiality and their records cannot be subpoenaed.[57] However, it only really refers to civil actions, not to criminal actions. So it's an area of some confusion. Some people feel that although ... the intention [behind the reporting requirement] is good, that it would wind up setting up a situation where quality assurance committees in hospitals would fear to do anything. I am not personally of that opinion but there is some strong feeling on the Board that that would be the case.[58]

It appears from this statement that, at least in 1987 when House Bill 70 was enacted, the State Medical Board interpreted the privilege provision in AS 18.23.030(a) as applying only to civil actions. Conley's comment before the House Judiciary Committee does not provide definitive insight into what the legislature intended when it initially adopted the peer review privilege in 1976. On the other hand, if legislators had disagreed with Conley's interpretation, it would have been a simple matter to amend the statute to clarify that the evidentiary privilege extended to criminal cases. "Where ... practical and contemporaneous interpretation has been called to the legislature's attention, there is more reason to regard the failure of the legislature to change the interpretation as presumptive evidence of its correctness." [59]

Moreover, House Bill 70 amended AS 18.23.030 in a manner that suggests the legislature adopted the State Medical Board's interpretation. As initially drafted, the bill made no mention of the peer review privilege in AS 18.23.030. But in a hearing before the House Judiciary Committee, Dale Shirk of the Health Association of Alaska expressed concern that the stricter hospital reporting requirement would require hospitals to release information that was protected from disclosure by the peer review privilege. Shirk suggested an amendment to AS 18.23.030 to ensure that only the State Medical Board had access to such reports.[60]

Conley drafted a proposed amendment that same day, which initially read: "The board shall hold such reports confidential and they shall be non-discoverable unless and until the board shall issue a final order of disciplinary action under AS 08.64.331(a)." [61] The language that was ultimately adopted as subsection AS 18.23.030(d) instead paralleled the privilege language in AS 18.23.030(a)— that is, it read that "information contained in a report submitted to the State Medical Board, and information gathered by the board during an investigation, under AS 08.64.336 is *not subject to subpoena or discovery*" unless and until the Board takes formal action on a practitioner's license.[62] Given Conley's statement that the peer review privilege in AS 18.23.030(a) was limited to civil actions, and the absence of any legislative discussion about expanding the privilege to criminal proceedings, it appears that the legislature intended the phrase *not subject to subpoena or discovery* to apply only to civil actions.

Furthermore, by eliminating the privilege once the Medical Board takes action on a

---

**57.** In his statement, Conley refers to the confidentiality provisions in "AS 18.23.020(d)." AS 18.23.020 has no subsection (d); nor, at the time, did AS 18.23.030. It appears therefore that Conley misspoke, as the only subsection in former AS 18.23 that discussed whether peer review information was subject to subpoena or discovery was AS 18.23.030(a).

**58.** Committee Minutes, House Judiciary Committee discussion of H.B. 70, Log No. 335–380, and audio tape (March 5, 1987).

**59.** 2B Norman J. Singer, *Statutes and Statutory Construction* § 49:10, at 117–18 (6th ed.2000).

**60.** Committee Minutes, House Judiciary Committee discussion of H.B. 70, Log No. 503, and audio tape (March 5, 1987).

**61.** Handwritten letter from Conley to Representative Sund, sponsor of H.B. 70 (dated March 5, 1987) (contained in House Judiciary Committee file on H.B. 70).

**62.** AS 18.23.030(d); ch. 87, § 19, SLA 1987 (emphasis added).

license, the legislature demonstrated its willingness to limit the privilege to serve other interests, even though doing so might result in some loss of candor in peer review proceedings. As noted above, Dale Shirk of the Health Association of Alaska had recommended giving only the State Medical Board access to such reports; the legislature instead opted for a narrower privilege, limiting access to the reports only until the Board takes formal action on a license.

Amicus Curiae Alaska Dental Society points out that a Michigan appeals court has interpreted Michigan's peer review privilege to extend to criminal cases. But although *In re Lieberman*[63] has some persuasive force as a policy decision, the statute it construes is distinguishable. It provides in full: "The records, data, and knowledge collected for or by individuals or committees assigned a review function described in this article are confidential and shall be used only for the purposes provided in this article, shall not be public records, and shall not be available for court subpoena."[64] The Michigan court thus was not obliged, as we are, to harmonize the broad language of its peer review privilege with other language in the statute that contradicts such a broad reading.

 Evidentiary privileges are narrowly construed.[65] We have found no legislative history conveying that the legislature intended the peer review privilege to apply in criminal actions, and the language of AS 18.23.030, considered as a whole, suggests that this was not the legislature's intent. We therefore conclude that the privilege in AS 18.23.030(a) does not extend to criminal cases.

 Furthermore, as the State points out, the peer review statute does not bar the use of evidence that is available from an independent source. After Fairbanks Memorial Hospital limited Grandstaff's privileges, the hospital was required by AS 08.64.336(b) to report that action to the State Medical Board.

Under AS 08.64.101, the State Medical Board has the dual responsibilities of examining applicants for licensing and imposing disciplinary sanctions. And the State Medical Board is classified as a peer review organization under AS 18.23.070(5)(B). Therefore, the general provisions regarding confidentiality and privilege of the records would apply. But, as discussed above, under AS 18.23.030(d), if the Board suspends, revokes, limits, or conditions a license, the information in a report submitted to the Board and information gathered by the Board in an investigation under AS 08.64.336 is subject to discovery by a plaintiff in any case.

The Board received the report from the hospital limiting Grandstaff's privileges. Grandstaff himself agreed to release information to the DOL during its investigation on behalf of the Board, including Dr. Dreiblatt's report. The DOL also obtained the records from Abbott Northwestern and the Sante Center as part of its investigation. During the investigation, Grandstaff spoke to an investigator from the DOL and admitted various instances of sexual misconduct with patients. The Board eventually received Grandstaff's agreement to surrender his license in lieu of revocation or other action. To the extent this information may have been protected by statute, the investigation was apparently complete when Grandstaff reached an agreement with the DOL to surrender his license. On the basis of this agreement, the Board entered an order accepting the agreement and confirming that Grandstaff was no longer licensed to practice medicine in Alaska. This action was consistent with the Board's powers to "suspend, revoke, limit, or condition" Grandstaff's license such that any privilege covering Grandstaff's admissions of sexual misconduct would apparently no longer apply under AS 18.23.030(d).

Additionally, the State argued in the superior court and here on appeal that the releas-

**63.** *In re Lieberman,* 250 Mich.App. 381, 646 N.W.2d 199 (2002).

**64.** *Id.* at 201–02 (quoting Mich. Comp. Laws § 333.21515 (1979)).

**65.** *Russell v. Anchorage,* 706 P.2d 687, 693 (Alaska App.1985).

es that Grandstaff supplied to the DOL waived any claim of privilege that Grandstaff might otherwise have asserted. The State maintained that under an objective evaluation of the releases, Grandstaff authorized the release to the Attorney General's office, including the division that prosecuted Grandstaff. Judge Beistline agreed with the State's analysis of the releases. While this may provide additional authority for the admission of the items released, we need not resolve this claim.

Grandstaff claims that Judge Beistline should have conducted an evidentiary hearing to develop the factual background for these claims. But for purposes of deciding Grandstaff's claims, Judge Beistline stated that he accepted Grandstaff's offers of proof regarding disputed factual issues. Grandstaff has not shown any error.

 Grandstaff argues in his reply brief that because his participation in the peer review process was compelled, his statements during peer review were not admissible under *Garrity v. New Jersey*.[66] Garrity and other police officers, who were questioned under oath in a court-ordered investigation, were warned that if they asserted their Fifth Amendment privileges, they would be removed from their positions.[67] The officers testified and their testimony was used against them in a later criminal trial.[68] The Supreme Court viewed the question in *Garrity* as whether a state "can use the threat of discharge to secure incriminatory evidence against an employee."[69] But the Fairbanks Memorial Hospital peer review process did not directly imperil Grandstaff's license. Furthermore, the statute at issue in *Garrity* mandated removal from office when an officeholder declined, on Fifth Amendment grounds, to answer questions relating to the office or employment. There is no similar provision in the statutes or regulations for the State Medical Board.

In *State v. Rivers*,[70] we addressed a claim similar to the one Grandstaff raises, and recognized the distinction between a situation where a person who asserts the privilege will be penalized for the mere act of asserting the privilege without regard to any other information in the case, and a situation where a person is free to assert the privilege but will then face the risk that, based on the remaining evidence, the court or administrative agency will decide the case against them.[71] Here, if Grandstaff had asserted the privilege against self-incrimination in the peer review process, and had not offered any explanation for his situation, he may have faced a negative result. But nothing in the record establishes that Grandstaff would have faced a negative result based solely on an invocation of his privilege against self-incrimination.

We reject Grandstaff's claim that his admissions were compelled by the peer review processes.

*The issues surrounding Sergeant Geier's testimony*

 The State called Sergeant Geier, the chief investigating officer in the case, to describe his role in the investigation of Grandstaff. Sergeant Geier obtained *Glass* warrants and search warrants as part of the investigation. At trial, Sergeant Geier authenticated the tape recordings of conversations between Grandstaff and S.Y. that were seized when the *Glass* warrants were executed. The State also offered several other exhibits during Sergeant Geier's testimony, including medical records, photographs, hotel records, phone records, and a pair of Grandstaff's underwear.

During cross-examination, Grandstaff's attorney asked Sergeant Geier to characterize Grandstaff's statements during his conversations with S.Y. He asked Sergeant Geier's opinion regarding whether Grandstaff wanted to have the conversation with S.Y., and

**66.** 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

**67.** *Id.*, 385 U.S. at 494, 87 S.Ct. at 617.

**68.** *Id.*, 385 U.S. at 495, 87 S.Ct. at 617–18.

**69.** *Id.*, 385 U.S. at 499, 87 S.Ct. at 620.

**70.** 146 P.3d 999 (Alaska App.2006).

**71.** *Id.* at 1005.

asked Sergeant Geier to describe concerns Grandstaff might have had when conversing with S.Y. Grandstaff's attorney asked Sergeant Geier whether Grandstaff had made any admissions in his first conversation with S.Y. Sergeant Geier responded that the only real admission that Grandstaff made during the first conversation was that Grandstaff and S.Y. knew each other, but that the conversation revealed that there was apparently some type of problem between them. The defense attorney asked Sergeant Geier if he had heard any "criminal admission" in that first conversation, which the defense attorney defined for Sergeant Geier as "anything that you as a police officer know is a crime." Sergeant Geier responded, "Off the top of my head, no." The attorney then asked if there was "even a hint of admitting criminality in any way" during the first conversation. Sergeant Geier replied, "None other-what I've already stated, sir." Grandstaff's attorney also asked Sergeant Geier whether Grandstaff had made any "criminal admissions" when S.Y. contacted him a third time to execute the *Glass* warrant. Sergeant Geier responded that Grandstaff had not.

On redirect, the prosecutor directed Sergeant Geier to specific sections of the recordings. He asked Sergeant Geier what significance he placed on Grandstaff's seeming concern about being recorded, given the fact that Grandstaff had not yet been approached by the police. Grandstaff objected, arguing that the prosecutor was improperly seeking Sergeant Geier's opinion on whether Grandstaff was guilty. The prosecutor told the court that the purpose of the question was to demonstrate that Grandstaff's statements reflected a concern that he might face prosecution, and that in light of Grandstaff's cross-examination, he was entitled to ask Sergeant Geier if that was how he characterized Grandstaff's statements. Judge Beistline overruled Grandstaff's objection that Sergeant Geier's statements constituted improper opinion testimony.

Sergeant Geier then answered, "Well, it was pretty obvious to me he was concerned of the police learning that he may have committed a crime, he had did some criminal wrongdoing, he was worried if the police

were going to find out about it and possibly . . . press charges against him."

The prosecutor then drew Sergeant Geier's attention to the point in the recording where S.Y. asked Grandstaff if he was having sex with anyone else. Grandstaff responded that he could not comment on that. The prosecutor asked if Sergeant Geier, "as an experienced investigator and one who was in charge of the case," had any reaction to Grandstaff's response. Sergeant Geier replied, "Well, it's a very—it's not an outright admission of—of a crime, however, it's a very incriminating statement."

Grandstaff's attorney then objected that this testimony violated Grandstaff's right to remain silent. The defense attorney asked Judge Beistline to stop the line of questioning and instruct the jury "to disregard any disparagement of the right to remain silent." The prosecutor countered that Grandstaff did not remain silent, and kept talking when he could have walked away. Judge Beistline denied the defense request.

Thereafter, the prosecutor inquired as follows:

> *Prosecutor:* Okay. And so the part that I want you to focus on is where [S.Y.] says, ["]if you don't think someone's recording this, then [ ] there's something wrong with my head, because you, you, you, you gave me Stadol and Mepergan at the Westmark and you knew I was an addict. What do you mean? You knew I was. What were you trying to pull? What, I, you've got to be thinking this is recorded.["] Okay, as an experienced officer, and in follow-up to counsel's question about . . . whether you observed him admit specifically to a crime, what is your reaction to this particular passage?
>
> *Sergeant Geier:* Well, again, his response, after she is talking, is—if you read it in the context of a transcript, it says, what, what do you want to know? He doesn't deny that there was any contact at the—at the Westmark. What are you—he doesn't say, what are you talking about, Stadol and Mepergan. It's a direct—to me, it's a direct acknowledgment that—in regards to the hotel incident, the existence of Mepergan and Stadol there. Just an

innocent person would deny the incident taking place and ask more questions to, you know, what the heck are you talking about.

Grandstaff's attorney renewed his objection "to the continued reference to the officer's giving his opinion that if someone is innocent, they will protest," because "there is a right of a defendant to simply say nothing and have his silence not held against him." (During cross-examination of Sergeant Geier, Grandstaff elicited testimony on this issue. He asked Sergeant Geier to admit that it was generally a police officer's philosophy that if "someone won't deny it, they've got to be guilty of what they didn't deny." Sergeant Geier responded that he believed that it was normal for a person to deny a false accusation.) Grandstaff asked first for a corrective instruction, then for a mistrial, on the ground that the prosecutor was intentionally disparaging a constitutional right.

The prosecutor responded that Grandstaff did not invoke silence, but instead talked for eight minutes during the first recorded conversation, and for forty-three minutes during the second, and made admissions during the course of both conversations. The prosecutor further argued that the questions were proper to rehabilitate the witness after the cross-examination questions impugned the competence of the investigation and the value of any admissions. Judge Beistline ruled that the door had been opened on cross-examination and the questions were proper, and denied the motion for mistrial.

The prosecutor then asked Sergeant Geier to point out the portions of the second recording with S.Y. that constituted admissions by Grandstaff.

Judge Beistline later decided not to give a corrective instruction on this point. He stated he would not instruct the jury that Grand-

staff's statements were or were not admissions, and he allowed the attorneys to argue this point to the jury. In his closing argument, the prosecutor stated that the significance of Grandstaff's failure to deny S.Y.'s reference to their sexual relationship was that "an innocent person would say [']what are you talking about[?']." Further, the prosecutor noted that Grandstaff "doesn't deny the hotel incident." In turn, Grandstaff's attorney minimized the significance of the tapes and argued that S.Y. had her own reasons for engaging in the conversations, such as her desire to bring a civil suit against Grandstaff.

Grandstaff argues on appeal that Sergeant Geier's testimony violated his right to silence. It is well-established that the prosecution cannot comment on the defendant's decision to remain silent when confronted by the police. In *Dorman v. State*,[72] the supreme court held that it was plain error for the prosecutor to ask the jury to infer guilt from the fact that the defendant remained silent for the eight minutes between his arrest and the time he was advised of his *Miranda* rights.[73] In *Silvernail v. State*,[74] we noted that evidence of pre-arrest silence also may be inadmissible, as both the innocent and the guilty may be intimidated by the "emotional and confusing circumstances" of the "hostile and perhaps unfamiliar atmosphere" of police interrogation.[75] We reversed Silvernail's conviction because we concluded it was plain error for the trial judge not to rule that the probative value of Silvernail's silence was outweighed by its prejudicial impact.[76] Similarly, in *Hamilton v. State*,[77] testimony that the defendant failed to express concern for anyone else when he was arrested was objectionable and should not have been admitted.[78] In each of these cases, however, the defendant was silent when confronted by the police.[79] Here, S.Y.

---

72. 622 P.2d 448 (Alaska 1981).

73. *Id.* at 456–57, 459.

74. 777 P.2d 1169 (Alaska App.1989).

75. *Id.* at 1176–77 (quoting *United States v. Hale*, 422 U.S. 171, 177, 95 S.Ct. 2133, 2137, 45 L.Ed.2d 99 (1975)).

76. *Id.* at 1174.

77. 59 P.3d 760 (Alaska App.2002).

78. *Id.* at 768.

79. *Dorman*, 622 P.2d at 452; *Silvernail*, 777 P.2d at 1172; *Hamilton*, 59 P.3d at 767.

contacted Grandstaff before the police approached him. More importantly, Grandstaff was not silent, instead choosing to stay and talk with S.Y. for eight and forty-three minutes in the first and second recorded conversations. Grandstaff's right to silence was therefore not implicated when he chose to talk with S.Y.

Next, Grandstaff argues that once his trial attorney objected to the testimony on constitutional grounds, it was plain error for the trial court to admit the evidence without weighing its probative value against the danger of unfair prejudice.

In *Silvernail,* the defendant testified that he participated in a kidnapping and murder under duress.[80] On cross-examination, the prosecutor asked Silvernail why he did not claim duress when the police first contacted him.[81] Silvernail's attorney objected on Fifth Amendment grounds, but the trial judge allowed the testimony.[82] On appeal, Silvernail argued that the evidence should have been excluded under Alaska Rule of Evidence 403.[83]

In reversing Silvernail's conviction, we noted the close relationship between the constitutional prohibition against evidence of an accused's silence in the face of official questioning and the low probative value of such evidence. Citing Alaska caselaw expressing distrust of silence as probative evidence of guilt, we ruled that the trial court's failure to weigh the probative value of the evidence against its potential for prejudicial harm was plain error.[84]

Grandstaff's situation differs from Silvernail's in two important respects. First, as discussed above, Grandstaff was contacted by S.Y., not by the police. In *Silvernail,* we expressly linked our analysis to the low pro-

bative value of silence in the face of official accusation.[85] Here, there was no official accusation. Even though Grandstaff objected on the ground that his right to silence was violated, that right was not implicated because he did not face an accusation by the police.

Second, Silvernail argued on appeal that the evidence should have been excluded because the probative value was outweighed by the risk of prejudice.[86] Grandstaff, in contrast, does not argue that the probative value of Sergeant Geier's testimony was outweighed by its potential for prejudice. At most, he suggests that the risk of prejudice was increased because Sergeant Geier was identified as the chief investigating officer and sat with the prosecution throughout the trial.

Grandstaff also argues that his statements do not meet the standard for an admission by silence as defined in *Doisher v. State.*[87] In *Doisher,* the court ruled that evidence of the defendant's purported admission by silence was prejudicial error; the court noted that Doisher's reluctance to engage in a controversy with his excited and irrational wife could explain his silence.[88]

Grandstaff argues that his reticence was equally understandable, given S.Y.'s claim that she was suicidal. The problem with this argument, however, is that *Doisher* concerned the applicability of a hearsay exception to admit an out-of-court statement.[89] Here, the trial court was faced with the propriety of the investigating officer's comment about an undisputedly admissible out-of-court statement.

Furthermore, as we already noted above, Grandstaff raised the issue of whether he

**80.** *Silvernail,* 777 P.2d at 1171.

**81.** *Id.* at 1172.

**82.** *Id.* at 1173.

**83.** A.R.E. 403 provides: "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**84.** *Silvernail,* 777 P.2d at 1175–76.

**85.** *Id.* at 1174.

**86.** *Id.*

**87.** 658 P.2d 119 (Alaska 1983).

**88.** *Id.* at 121–22.

**89.** *See id.* at 120.

had made any admissions during cross-examination. Because Grandstaff raised this issue, the State was entitled to address that point during redirect examination.

Grandstaff argues that the State should not have been allowed to elicit Sergeant Geier's testimony that Grandstaff demonstrated consciousness of guilt when, during Grandstaff's conversations with S.Y., he expressed concern that S.Y. might be surreptitiously recording the conversations, and when he declined to answer S.Y.'s question as to whether he was having sex with any other woman.

Sergeant Geier was allowed to testify that, based on Grandstaff's fears of being secretly recorded, "it was pretty obvious ... [that Grandstaff] was concerned [about] the police learning that he may have committed a crime[;] he was worried [that] the police were going to find out about it and ... press charges against him." Sergeant Geier was also allowed to testify that Grandstaff's refusal to say whether he was having sex with someone besides S.Y. was "very incriminating."

The State argues that this testimony was admissible because, when Grandstaff's attorney cross-examined Sergeant Geier, the defense attorney was able to get Sergeant Geier to concede that Grandstaff had never admitted any criminal behavior during his conversations with S.Y. The State suggests that, because Grandstaff raised this issue, the prosecutor was entitled to address this point during his redirect examination of Sergeant Geier.

It is true that the prosecutor was entitled to address this point. But the prosecutor was not entitled to address it with inadmissible evidence.

When the prosecuting attorney elicited Sergeant Geier's testimony about the significance of Grandstaff's fear of being recorded, and the significance of Grandstaff's refusal to say whether he was engaging in sexual rela-

tions with other women, the prosecutor explicitly asked Sergeant Geier to express his expert opinion "as chief investigating officer [in this case, and] as an experienced police officer." This was an improper use of expert testimony.

The Alaska Supreme Court addressed a similar situation in *Kodiak v. Samaniego*.[90] *Samaniego* involved a civil lawsuit in which the plaintiffs alleged that police officers had used unlawful force against them.[91] The trial judge prevented the City of Kodiak from presenting an expert witness who would have offered an opinion as to whether, under the facts of the case, the officers' use of force against the plaintiffs had been appropriate.[92]

Alaska Rule of Evidence 702 states that expert testimony may be admitted "[i]f scientific, technical, or other specialized knowledge *will assist the trier of fact* to understand the evidence or to determine a fact in issue."[93] This requirement—that the witness's expertise will help the trier of fact—means that experts should not be allowed to "stat[e] their own conclusions on points that the jury is ... equally capable of determining [for themselves]."[94]

Thus, in *Samaniego*, the supreme court held that the trial judge properly excluded this proposed expert testimony because (1) it was the jury's job to assess the conflicting evidence and determine the facts of the encounter between the plaintiffs and the police, and (2) it was the trial judge's job to identify the applicable law governing the use of force, and to instruct the jury on that law. The expert's opinions on these matters would not have appreciably assisted the jury.[95]

In Grandstaff's case, the prosecutor could certainly argue to the jury that Grandstaff's fear of being recorded, and his reticence to reveal his sexual relations with other women, suggested a consciousness of guilt. But neither Sergeant Geier's years of experience as a police officer, nor his role as the chief

---

90. 83 P.3d 1077 (Alaska 2004).

91. *Id.* at 1081

92. *Id.*

93. A.R.E. 702 (emphasis added).

94. *Samaniego,* 83 P.3d at 1088 (original brackets omitted).

95. *Id.* at 1088–89.

investigator in this case, provides any reason to believe that Sergeant Geier had special insight into the significance of these matters beyond what the jurors could discern for themselves. It was therefore error for the trial judge to allow the State to elicit this testimony.

Nevertheless, we conclude that this error was harmless. The prejudice of this testimony was the fact that the prosecutor was attempting to bolster an argument about the significance of Grandstaff's actions—an argument that was otherwise proper—by showing that an expert criminal investigator had drawn this same inference. In a close case, this kind of bolstering might have had a significant effect on the jury's deliberations. But given the length of Grandstaff's trial and volume of evidence presented, we conclude that the error in eliciting Sergeant Geier's personal opinion on these matters was harmless.[96]

Finally, Grandstaff argues that Sergeant Geier's testimony violated the attorney-client privilege, because Grandstaff could not explain why he answered S.Y. the way he did without revealing confidential communications with counsel. Grandstaff offers no authority to support this assertion. Grandstaff also asserts, without explanation, that the testimony violated his right to counsel. But Grandstaff's right to counsel had not yet attached, as no formal charges were pending and the case was still in its investigatory stages.[97]

We conclude that Judge Beistline did not abuse his discretion by overruling Grandstaff's objections to Sergeant Geier's testimony.[98] We also conclude that Judge Beistline did not abuse his discretion when he denied Grandstaff's motion for a mistrial on the same grounds.[99]

*We uphold the remainder of the superior court's challenged evidentiary rulings*

 Grandstaff challenges a number of the trial court's other evidentiary rulings. He argues that Dr. Dreiblatt should not have been allowed to testify about Grandstaff's sexual fantasies about other female patients. Grandstaff asserts that this evidence was irrelevant and prejudicial, and states in his reply brief that this evidence was similar to the character evidence that was improperly admitted in *Bingaman v. State.*[100] Grandstaff does not explain why the evidence was prejudicial or improper, however.

In *Stevens v. State,*[101] we ruled that testimony about the defendant's sexual fantasies was inadmissible character evidence and should not have been admitted.[102] We noted that the evidence was not relevant to show proof of motive, intent, plan, or any other reason acceptable under Evidence Rule 404(b), and its only possible relevance was to show Stevens's propensity to commit a sex crime.[103] We nonetheless held that the error was harmless due to the strength of the State's case, the brevity of the challenged evidence, and the fact that the prosecutor did not mention the subject again.[104]

Here, the evidence was presented as part of testimony about how Grandstaff chose his victims. Dr. Dreiblatt testified, without objection from Grandstaff, that Grandstaff admitted that he had sexual fantasies about S.Y. and S.P., and that he chose addicts who were unhealthy and vulnerable for sexual relationships. When Grandstaff's attorney

**96.** See *Love v. State,* 457 P.2d 622, 629–31 (Alaska 1969).

**97.** See *Carr,* 840 P.2d at 1005; *Thiel,* 762 P.2d at 482–83.

**98.** See *Hawley v. State,* 614 P.2d 1349, 1361 (Alaska 1980).

**99.** See *Hamilton,* 59 P.3d at 769.

**100.** 76 P.3d 398 (Alaska App.2003).

**101.** 748 P.2d 771 (Alaska App.1988).

**102.** *Id.* at 774.

**103.** *Id.* A.R.E. 404(b)(1) provides: "Evidence of other crimes, wrongs, or acts is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith. It is, however, admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

**104.** *Stevens,* 748 P.2d at 775.

objected to the question about other female patients, the prosecutor stated that the evidence was admissible to show Grandstaff's view of his patient population. The court allowed only the one question and answer. The prosecutor did not mention fantasies about other patients again.

Grandstaff also challenges Dr. Dreiblatt's testimony about "grooming." This argument seems to refer to Dr. Dreiblatt's testimony that Grandstaff actively sought addicts who were unhealthy and vulnerable in order to initiate sexual relationships. The prosecutor returned to this theme in his closing, arguing that Grandstaff's manner of choosing his victims was "predatory conduct," similar to the predatory conduct of child molesters. Though this is an inflammatory statement, Grandstaff does not explain why he contends that it was unfairly prejudicial. Grandstaff also has not shown where he objected to this testimony during trial.

Dr. Dreiblatt's testimony about Grandstaff's sexual fantasies about other patients was arguably admissible under Evidence Rule 404(b)(1). Furthermore, this portion of Dreiblatt's testimony was brief, and the prosecutor did not mention it again. We conclude that any error in admitting this evidence was harmless.

▮ Grandstaff next argues that certain testimony from S.P. was prejudicial and irrelevant. Because Grandstaff did not object to this testimony during the trial, he must now show plain error.[105]

S.P. testified that she did not go to the police to accuse Grandstaff because she had been a victim of crime on two previous occasions and had not been satisfied when she contacted the authorities. She also testified that around the time of her birthday in 1998, while she was under Grandstaff's care, she was raped by her neighbor, but did not report the incident to police because she was not satisfied with the response of the justice system. She did, however, tell Grandstaff.

And S.P. testified that when she told Grandstaff about the rape, he put her hand on his penis and told her she would feel better if she massaged it, then wrote her a prescription for Xanax.

S.P.'s testimony was relevant. S.P. testified that she did not get justice in the past when she reported crimes in response to the question of why she did not go to the police this time. And S.P.'s testimony about her neighbor's sexual assault was part of the factual background of a specific incident of sexual contact with Grandstaff. And Grandstaff's prescription for Xanax supported the State's theory that Grandstaff provided drugs to patients in return for sexual favors.

Grandstaff cites *Worthy v. State*[106] for the proposition that the prosecution may not introduce evidence that the victim was raped previously in order to portray the defendant "as a man so bad that he raped someone he knew was particularly vulnerable because she had just been raped by someone else."[107] Grandstaff misconstrues the issue in that case. In *Worthy,* the relevance and admissibility of the previous sexual assault was not disputed; the issue was whether Worthy could introduce evidence that the previous sexual assault did not actually occur.[108] The trial court's refusal to admit such evidence was reversible error.[109]

S.P.'s testimony that she had been raped previously was properly admitted and was, therefore, not plain error.

▮ Grandstaff argues that the evidence supporting the sexual assault claims was weak, and that he was only convicted on these counts because of improper character evidence that portrayed him as a bad man. Grandstaff argues that the prosecutor inappropriately furthered this idea in his closing argument, when he argued that Grandstaff sexually assaulted S.Y. at the Westmark Hotel:

Do you think in light of everything that you know about this man, do you think

105. *See Raphael v. State,* 994 P.2d 1004, 1015 (Alaska 2000).

106. 999 P.2d 771 (Alaska 2000).

107. *Id.* at 774.

108. *Id.* at 773.

109. *Id.* at 775.

that in light of all the things that he has said to Dr. Dreiblatt and on the wire, that he's the kind of guy that's going to respect the situation and say I'm not going to take advantage of her? No. He's there, he's ready to go, and he jumped on her bones.

Grandstaff relies on *Bingaman,* in which this court stressed that a jury may not convict a defendant because it believes he deserves to be punished for other bad acts.[110] In *Bingaman,* we ruled that the admission of evidence of approximately sixty prior acts of unindicted misconduct was reversible error.[111] Grandstaff's current objection, in contrast, refers to part of the prosecutor's argument. The jury was specifically instructed that the arguments of counsel are not evidence. Grandstaff does not point to any evidence that might have improperly swayed the jury to convict him for sexual assault because they thought he was a bad man.

■ Grandstaff next argues that Judge Beistline erred in admitting into evidence a photograph of Grandstaff's underwear. When executing the search warrant for Grandstaff's residence, Sergeant Geier seized a pair of Grandstaff's underwear. A photograph of the underwear was admitted into evidence. S.P. testified that Grandstaff wore underwear that resembled racquetball or bicycle shorts, and were different colors, such as tan, brown, or white. The underwear seized by Sergeant Geier was similar to those described by S.P., but the underwear was blue. Grandstaff argues that the photograph was prejudicial and irrelevant because the underwear was not the same color as those described by S.P., and because most men wear underwear. But Judge Beistline ruled that the difference in color went to the weight of the evidence, not to its admissibility. He agreed with the prosecutor that the evidence tended to corroborate S.P.'s testimony. We conclude that this ruling was not an abuse of discretion.

■ Grandstaff next argues that C.R.'s testimony about how Grandstaff's conduct had affected her was inflammatory and ir-

relevant, and would have been more appropriate at sentencing. Grandstaff does not discuss the factual basis of this claim and provides no authority to support it.

The prosecutor asked C.R. at the close of her direct examination if there was anything she wanted to say to Grandstaff. Defense counsel objected, and the court sustained the objection. The prosecutor rephrased the question, asking C.R. what effect Grandstaff's conduct had had on her. Defense counsel again objected on relevance grounds. While the judge agreed that the question was not relevant to what happened on particular dates, he allowed C.R. to answer. C.R. testified:

> The results of being—being Dr. Grandstaff's patient, I have anxiety attacks, depression, just like after I leave here today, I will have to go lay down. Depression, can't sleep, can't even go to school. Can't concentrate. I—it's indescribable. My—my life is just upside down, just because what this animal—oh, he—the animal do[es] have a name-Grandstaff-[has] done to me and my life.

Even if this testimony should not have been allowed, any error was harmless considering the rest of C.R.'s testimony. C.R. testified, without objection, that Grandstaff knew of her history of drug addiction and prostitution, that she felt he was taking advantage of her and pulling her back into her old ways, and that she suffered from depression and anxiety attacks as a result of his conduct. C.R.'s statement about the effect of Grandstaff's conduct added little to this testimony. Furthermore, this evidence tended to show reasons why C.R. might be biased against Grandstaff.

■ Grandstaff next argues that the written agreement limiting his hospital privileges at Fairbanks Memorial Hospital and the agreement to voluntarily surrender his medical license, both of which included admissions of sexual misconduct with patients, were more prejudicial than probative and should not have been admitted. Grandstaff argues that the exhibits proved nothing more

110. *Bingaman,* 76 P.3d at 414–15.

111. *Id.* at 401–02.

than the fact he had sex with his patients, which was not disputed, and that there was a danger that the jury would fail to distinguish between ethical and criminal misconduct.

The documents were relevant because they contained Grandstaff's admissions that he had engaged in sexual contact with his patients, which led to his discharge from his clinic, the action on his hospital privileges at the hospital, and the voluntary surrender of his medical license. As to the agreement limiting Grandstaff's hospital privileges, the document was admitted into evidence with substantial redactions. While defense counsel objected to the admission of the document even in its redacted form, the prosecutor agreed to redact everything to which Grandstaff's attorney objected. Further, defense counsel specifically distinguished between ethical and criminal misconduct in his closing argument:

> If you're asking me to say there was a reason for the sexual contact, I'm not going to say that. I'm not going to say that, but there's a difference between a professional who's doing something that's an improper sexual contact and a sexual assault. One's unethical, it'll get your license yanked; the other one is criminal, it'll get you in jail.

Under these circumstances, Judge Beistline did not abuse his discretion in admitting the two documents. The significance of the admissions contained in the documents was properly left to the jury to decide.

■ Grandstaff next argues that a phone message was improperly admitted into evidence. Rebecca Dean, an administrator at Grandstaff's clinic, testified about a phone call she received while working at the clinic. The phone call was from a Fairbanks physician and involved allegations that Grandstaff was sexually involved with a female patient. Dean testified that she wrote notes memorializing the call on a phone message slip. Over Grandstaff's objection, Judge Beistline admitted the written phone message, which included the notes Dean took when she spoke with the physician. Grandstaff argues that the message slip was hearsay and challenges

Judge Beistline's ruling that it was admissible under the business records exception to the hearsay rule.[112]

The handwritten note was offered to establish why the clinic began to investigate Grandstaff. As such, it was not hearsay, as it was not offered to prove the truth of the matter asserted, that Grandstaff was sexually involved with a female patient.[113]

■ Grandstaff also argues that the trial court should not have admitted evidence that his clinic reimbursed funds to the Medicaid provider for Grandstaff's services. Dean testified that clinicians on the clinic's investigative committee reviewed the medical charts of S.Y. and S.P. and determined that some of the services provided by Grandstaff lacked legitimate purpose. The clinic then prepared refund checks for those services. Dean testified that the refunds were not requested by Medicaid, but were undertaken voluntarily to comply with federal billing regulations.

Grandstaff argues that Dean's testimony and the letter sent to Medicaid providing notification of the refund were hearsay because Dean had no personal knowledge of whether any particular service lacked medical purpose. But Dean testified repeatedly on cross-examination that the determinations of medical purpose were made by the clinic's physicians, and that as a lay person without medical expertise, she had not been involved in those decisions. Judge Beistline overruled the hearsay objection at trial and admitted the document and the testimony under the business records exception. Grandstaff has not challenged that ruling on appeal.

Grandstaff argues that the probative value of the evidence was outweighed by its prejudicial impact. He notes that Medicaid fraud investigator Rebecca Starry testified that the clinic conducted an unsolicited review of Grandstaff's patients' records, that she did not know the basis for the clinic's calculations, and that she could not answer what, if anything, the refund proved. But Grandstaff did not argue at trial that the evidence was more prejudicial than probative, so the issue

---

**112.** *See* A.R.E. 803(6).

**113.** *See* A.R.E. 801(c).

was not preserved.[114] The argument is also without merit. Dean testified that refunds were made because the committee believed it was the "appropriate diligent thing to do," because it was unclear to the committee whether or not the billing was appropriate. No one testified, and the State did not argue, that the refunds accurately reflected the amount Medicaid was overbilled. Judge Beistline offered to instruct the jury that the fact that the clinic refunded the money billed for specific services did not necessarily establish that those services were without medical purpose, and that this decision was for the jury. But Grandstaff's trial attorney did not request the instruction.

 Even if this evidence was admitted improperly, any error was harmless. As noted above, Dean testified that it was unclear to the committee whether or not the billing for any particular service was appropriate. While cross-examining Dean, Grandstaff's trial attorney showed that many of the services for which refunds were paid were not included in the theft counts. The attorney repeated this point in closing, arguing that the services for which the clinic refunded Medicaid were inconsistent with the services that Dr. Parran determined lacked medical purpose.

*We uphold the superior court's denial of a mistrial*

 Grandstaff argues that Dr. Parran inappropriately referred to sexual contact between Grandstaff and four patients when only S.Y. and S.P. testified to Grandstaff's sexual misconduct. Grandstaff contends that admission of evidence of unindicted sexual misconduct is reversible error.[115]

On direct examination, the prosecutor asked Dr. Parran a series of hypothetical questions about a physician having sexual relations with four patients; Dr. Parran testified that there would be no legitimate medical purpose for sexual relations between a

doctor and his patients. On cross-examination, defense counsel asked Dr. Parran if it would have helped him to interview "any of these patients." Dr. Parran said no, because "these are four patients, all with well-documented histories of addiction, all with evidence in their charts document[ing] that they're out of control intermittently with their use of—of the prescribed controlled drugs, and—and all having had alleged advances or—or sexual relationships with the doctor."

. Grandstaff moved for a mistrial, arguing that Dr. Parran could not testify that Grandstaff had sex with four patients when he was only charged with sexual misconduct with two patients. The court denied the motion, finding that the comment was a passing reference made as Dr. Parran explained the basis of his conclusion that there was no medical purpose in Grandstaff's treatment of these patients; Judge Beistline offered to give the jury a limiting instruction, but Grandstaff declined the offer. Further, Dr. Parran did not state that Grandstaff actually had sexual relations with all four patients, but only that all four claimed to have had sexual relationships with Grandstaff. And with respect to E.S., the jury acquitted Grandstaff of all charges relating to E.S. Under these circumstances, we conclude that Judge Beistline did not abuse his discretion in denying Grandstaff's motion for a mistrial.

*The jury instructions regarding medical purpose*

 Grandstaff argues that there was a flaw in the jury instructions relating to the charges of unlawful distribution of controlled substances. The State charged that Grandstaff unlawfully delivered controlled substances to the women in this case by writing prescriptions for them when he knew that their use of controlled substances would

114. *See Groff v. Kohler,* 922 P.2d 870, 875 (Alaska 1996).

115. *See Haakanson v. State,* 760 P.2d 1030, 1038 (Alaska App.1988) (finding error in admission of evidence of sexual contact with two victims not named in indictment). Grandstaff cites three

other cases from the 1980s in which the admission of evidence of unindicted sexual misconduct was held to be error. All three are superseded by A.R.E. 404(b)(2) or (3) and are no longer good law.

serve no medical purpose.[116]

Grandstaff argues that Jury Instruction 18 misstated the law by defining an unlawful prescription as one without a "legitimate medical purpose." The instruction stated, in pertinent part:

The defendant in this case was a licensed physician during the time periods alleged in the Indictment. As such, he was permitted to treat patients and to cause the delivery of controlled substances to them by pharmacists, for treatment by means of prescriptions, provided he issued the prescriptions lawfully. The prescriptions in this case were unlawfully issued if there did not exist a legitimate medical purpose for them.

A legitimate medical purpose in this context was present if (1) the defendant's purpose in issuing the prescription(s) was medical, (2) the prescription(s) was reasonably necessary for treatment of the patient's illness or injury, and (3) the prescription(s) was issued by the defendant while acting in good faith within the usual course of his professional practice and in accordance with a standard of medical care generally recognized and accepted within the medical community.

The drug counts in Grandstaff's indictment were based on AS 17.30.080, which makes it a crime to distribute scheduled drugs "other than for a medical purpose." Alaska Statute 17.30.080 provides, in pertinent part:

Unlawful administration, prescription, and dispensation of controlled substances. (a) A controlled substance classified under federal law or in a schedule set out in AS 11.71.140–11.71.190 may not be administered, prescribed, dispensed, or distributed other than for a medical purpose.

(b) A person who violates (a) of this section, or who otherwise manufactures, distributes, dispenses, or conducts research with a controlled substance in the state without fully complying with 21 U.S.C. 811–830 (Controlled Substances Act), and regulations adopted under those sections, is guilty of misconduct involving a controlled substance.

Grandstaff contends that the jury instructions relating to these unlawful delivery counts allowed the jury to convict him based merely on proof that he committed malpractice when he wrote these prescriptions—*i.e.*, proof that, in retrospect, a reasonable doctor in Grandstaff's situation would not have written the prescriptions. Grandstaff further argues that the instructions allowed the jury to convict him on proof that he had some non-medical purpose for distributing the drugs in addition to a proper medical purpose.

In the instruction defining the elements of the crime, the jury was told that the State had to prove three things: (1) that Grandstaff knowingly delivered controlled substances to the women; (2) that his delivery of controlled substances "had no medical purpose"; and (3) that Grandstaff recklessly disregarded the fact that there was no medical purpose for the delivery.

Grandstaff does not challenge the wording of this instruction. (In fact, this instruction used essentially the same language that Grandstaff proposed.) However, Grandstaff argues that there are substantial errors in the subsidiary instructions relating to these drug-distribution charges.

Grandstaff's first argument centers on the purported distinction between a "medical purpose" and a "*legitimate* medical purpose." As noted above, the elements instruction told the jury that the State was obliged to prove that there was no "medical purpose" for distributing the drugs to the women. However, an accompanying instruction explained that Grandstaff's act of writing prescriptions for the women was unlawful "if there did not exist a legitimate medical purpose for [the prescriptions]."

This same accompanying instruction then stated that prescriptions have a "legitimate medical purpose" only if "(1) the [doctor's] purpose in issuing the prescription(s) was medical, (2) the prescription(s) [were] reasonably necessary for treatment of the patient's illness or injury, and (3) the prescription(s) [were] issued by the [doctor] while acting in good faith within the usual course of ... professional practice and in accordance with

116. *See* AS 17.30.080(a).

a standard of medical care generally recognized and adopted within the medical community."

Grandstaff argues that, when these two jury instructions are read together, the jurors would conclude that, even if Grandstaff honestly believed that there was a medical purpose for writing the prescriptions, Grandstaff should nevertheless be convicted if the State proved that Grandstaff's decision to write the prescriptions fell below the standard of practice "generally recognized and adopted within the medical community," and that, viewed objectively and in retrospect, the drugs were not "reasonably necessary for treatment of the [women's conditions]."

If Grandstaff's analysis of the two jury instructions were correct, his case would pose a significant question as to whether he received due process of law. However, Grandstaff's analysis is not correct.

It is true that the challenged instruction defines "medical purpose" in terms of the standard of practice recognized and accepted in the medical community. But this definition relates only to the second of the three elements listed in the elements instruction. As explained above, the elements instruction conveyed that the State was required to prove *not only* that there was no medical purpose for writing the prescriptions, but *also* that Grandstaff recklessly disregarded this fact.

In other words, the jurors were told that the State had to prove either that Grandstaff knew that there was no medical purpose for prescribing the drugs to the women, or at least that Grandstaff was subjectively aware of, and consciously disregarded, a substantial and unjustifiable risk that he was committing malpractice when he wrote these prescriptions—*i.e.,* that his prescription of the drugs to the women fell below the acceptable standard of practice within the medical community.[117]

Because the elements instruction required the State to prove this culpable mental state, there was no danger that Grandstaff would be convicted of felonies for honestly but in-

competently prescribing controlled substances.

Grandstaff also argues that the jury instructions allowed the jury to convict him if he had some non-medical purpose for writing the prescriptions, even if he also had a proper medical purpose for doing so. Again, if Grandstaff's analysis of the instructions were correct, this would raise significant due process problems. Presumably doctors often have two or more purposes for writing prescriptions. For instance, a young doctor may prescribe a medication for completely valid medical reasons, but the doctor may also hope that, by prescribing a medication that will cure the patient or at least ease the patient's symptoms, the patient will be prompted to recommend the young doctor to friends and family—thus helping the doctor's practice grow. It would seem strange (not to say unconscionable) to convict the doctor of a felony in such a situation.

But the jury instructions did not say that Grandstaff could be convicted if he had some purpose for writing the prescriptions *in addition to* a valid medical purpose. Rather, the elements instruction required the State to prove that there was *no* valid medical purpose for writing the prescriptions—and that Grandstaff knew of, or was at least reckless concerning, this circumstance. We therefore conclude that this challenge to the jury instructions also has no merit.

As noted earlier, the statute in effect at the time of Grandstaff's offense prohibited him from writing a prescription for controlled substances for any reason "other than for a medical purpose." Grandstaff argues that the court erred by departing from this statutory language and defining "medical purpose" as "legitimate medical purpose." He argues that a decision to write a prescription could fall below the generally accepted standard of care and still serve some medical purpose—for instance, an experimental, research, or other non-therapeutic purpose.

Grandstaff's argument seems to be premised on the implicit assertion that the prescription of drugs for authorized medical research or clinical trials does not qualify as a

**117.** *See* AS 11.81.900(a)(3) (defines "recklessly").

prescription for a "legitimate medical purpose." Grandstaff cites no authority supporting this assertion, and we find the assertion unconvincing. The prescription of controlled substances in the course of authorized medical research and clinical trials appears to fall squarely within the realm of legitimate medical purposes and to meet the accepted standard of medical care.

Grandstaff's argument is also premised on the assertion that there is a significant difference between a "medical purpose" and a "legitimate medical purpose." We believe that, in the context of AS 17.30.080, these phrases are equivalent. It is extremely unlikely that the legislature, in enacting this statute, intended to exempt (that is, intended to endorse or authorize) the writing of prescriptions for illegitimate medical purposes.[118]

But even assuming that, in some contexts, there might be a meaningful difference between a "medical purpose" and a "legitimate medical purpose," there was no error in this case. Grandstaff did not argue at trial—nor does he argue in his brief to this court—that he wrote the challenged prescriptions for a non-conformist medical purpose that was not generally accepted by the medical community. Rather, Grandstaff claimed that he wrote the prescriptions for valid therapeutic reasons that the medical community recognized as legitimate. He pointed to evidence that other doctors prescribed the same or similar medications for the conditions he was treating in his patients.

Having heard Grandstaff's evidence and argument, the jury rejected this claim. And given this evidence and argument, we conclude that the jury's decision would have been no different if the trial judge had instructed the jury in the manner Grandstaff requested.

*The variance claim regarding the second-degree sexual assault conviction*

 Grandstaff contends that there was a fatal variance between the conduct he was convicted of in Count 68, the second-degree sexual assault of S.P., and the charge in the indictment.

The State instructed the grand jury that although it would hear testimony about multiple sexual encounters, the second-degree sexual assault charged in Count 68 stemmed from the first alleged nonconsensual sexual act involving S.P. that occurred in an exam room at Grandstaff's clinic. S.P. testified at grand jury that she started seeing Grandstaff in October or November of 1996; that the initial visits were characterized by a normal doctor-patient relationship; and that this changed when he fondled her breast, without her consent, some time in late 1996 or early 1997. When the grand jury returned the indictment, Count 68 stated, "That between the approximate dates of October 31, 1996 and March 31, 1997, at or near Fairbanks in the Fourth Judicial District, State of Alaska, Stephen Grandstaff did unlawfully and knowingly engage in sexual contact with S.P. without her consent."

At trial, S.P. testified that Grandstaff first fondled her breasts in late October or early November of 1996, and that they began having intercourse in November or December of that year. On redirect, she confirmed that the first incident occurred on her third or fourth visit, sometime after her first visit on October 31, 1996, and before she was diagnosed with herpes on March 27, 1997.

Grandstaff argues that a variance occurred because S.P. told the grand jury that Grandstaff first touched her inappropriately in late 1996 or early 1997, and testified at trial that the first incident occurred in late October or early November of 1996. Because S.P. testified about more than one sexual act, Grandstaff argues that he may have been convicted of a different offense than the one in the indictment. The prosecutor specified in his closing, however, that the sexual assault occurred when Grandstaff "touched her without her consent, when he made his move on her."

Grandstaff relies on *Simpson v. State*,[119] a case where this court reversed Simpson's

---

118. *State v. Vakas*, 242 Kan. 103, 744 P.2d 812, 815 (1987) ("Whether a controlled substance is prescribed for a 'legitimate medical purpose' as opposed to a 'medical purpose' is to create a distinction without a difference.").

119. 705 P.2d 1328 (Alaska App.1985).

conviction for sexual abuse of a minor because of a variance. The victim in *Simpson* described two distinct incidents; trial testimony indicated that the first incident was a touching, while the second incident was an attempted touching.[120] While the indictment specified the date of the second incident, Simpson was convicted of the first incident.[121] We stated that while "an indictment is sufficient which charges a specific incident, the precise date of which the witness is uncertain, the witness must nevertheless have a specific incident in mind."[122] In reversing the conviction, we held that Simpson was convicted of a different incident than the one specified in the indictment.[123]

In Grandstaff's case, the indictment charges a specific incident, the date of which was not precise. The State specified to both the grand jury and the trial jury that the sexual assault count was for the first time Grandstaff sexually contacted S.P. without her consent.

A variance between the date specified in the indictment and the date shown by the evidence at trial is not a material defect unless the defendant can show he was actually prejudiced in his ability to prepare or present his defense at trial.[124] Grandstaff has alleged no such prejudice. We conclude that Grandstaff has not shown a variance that requires reversal of the conviction on this count.

*Sufficient evidence was admitted to sustain the sexual assault convictions*

█ Grandstaff argues that the evidence admitted at trial was not sufficient to sustain the convictions for Count 26, the first-degree sexual assault of S.Y., and Count 68, the second-degree sexual assault of S.P. Evidence is sufficient to support a conviction when reasonable jurors could conclude that the defendant's guilt has been established beyond a reasonable doubt.[125] When we review the sufficiency of the evidence supporting a conviction, we view the evidence and the reasonable inferences from the evidence in the light most favorable to the State.[126]

Grandstaff analyzes the evidence in the light most favorable to himself by focusing on the testimony of the two victims and attempting to impeach their testimony. He argues that S.Y.'s testimony is full of contradictions, and that S.P.'s uncertainty about the date of Grandstaff's first sexual contact with her renders her memory too faulty to be reliable.

S.Y. testified that she passed out at the Westmark Hotel after taking a combination of Stadol and Mepergan. Although she told Grandstaff before she passed out that she did not want to have sex, when she regained consciousness, she was naked and Grandstaff was engaged in sexual intercourse with her. Dr. Parran testified that the combination of drugs S.Y. ingested would have made S.Y. very sleepy and sedated, as well as mentally altered. S.Y.'s mother testified that S.Y. called her that night, and that her speech was slurred and incoherent. S.Y.'s mother also testified that Grandstaff called the next day, asked how S.Y. was doing, and then hung up.

S.P. testified that on one of her first visits to Grandstaff, when he was listening with a stethoscope on her torso, he began to fondle her breasts. In addition, he kissed her neck, her mouth, and her breasts. She asked him to stop, but he continued.

Grandstaff argues that this evidence is insufficient to support the convictions for sexual assault. This argument is without merit because Grandstaff views the evidence in the light most favorable to his argument, and not in the light most favorable to sustaining the convictions. Grandstaff's argument consists of reasons why the jury should not have believed S.Y. and S.P. But after hearing the

---

**120.** *Id.* at 1330.

**121.** *Id.*

**122.** *Id.* (quoting *Covington v. State*, 703 P.2d 436, 440 (Alaska App.1985)).

**123.** *Id.* at 1331.

**124.** *Larkin v. State*, 88 P.3d 153, 154 (Alaska App.2004).

**125.** *See, e.g., Dorman*, 622 P.2d at 453; *Deal v. State*, 657 P.2d 404, 405 (Alaska App.1983).

**126.** *Dorman*, 622 P.2d at 453.

evidence, the jury found Grandstaff guilty of the charges. We find that there was sufficient evidence to support the convictions.

*Grandstaff's attacks on his sentencing and his sentence*

■ Judge Beistline imposed an 8–year term with 3 years suspended for the first-degree sexual assault of S.Y. He imposed a 7–year term with 3 years suspended for the second-degree sexual assault of S.P. For each conviction for second-degree misconduct involving a controlled substance, Judge Beistline imposed a 10–year term with 5 years suspended, to be served concurrently. For each conviction for fourth-degree misconduct involving a controlled substance, Judge Beistline imposed a 3–year term with 1 year suspended, to be served concurrently. For each of the three theft convictions, Judge Beistline imposed a 3–year term with 1 year suspended, to be served concurrently. The composite sentence was a 34–year term with 15 years suspended, a 19–year term to serve. Grandstaff advances several arguments about his sentencing and sentence.

At sentencing, the State called two other women who were Grandstaff's former patients to testify. Their testimony described misconduct on Grandstaff's part that was similar to the misconduct for which the jury convicted him.

C.T. testified that she sought treatment from Grandstaff for post-traumatic stress syndrome and Valium addiction. At one point, Grandstaff conducted a pelvic exam, and touched C.T. in a way that made her feel uncomfortable. When asked on cross-examination if she believed Grandstaff was trying to sexually assault her, C.T. replied, "I think that Dr. Grandstaff was—was coming to that. I think that I was being groomed for a sexual assault by Dr. Grandstaff." Grandstaff argues that C.T.'s use of the word "groomed" proves she was "obviously coached by the prosecution," and that the court should have disregarded her testimony.

S.L. testified that she was hospitalized after she overdosed on the medications prescribed by Grandstaff. When she awoke in her hospital bed the next morning, though she was "very groggy ... and not quite awake," she felt as if she was being touched between her legs. She was "shocked" to discover Grandstaff sitting in her room with the door closed. Grandstaff contends that S.L. did not present verified reliable evidence of a sexual assault.

■ A trial judge may consider evidence of prior uncharged misconduct at a defendant's sentencing if the misconduct is verified.[127] Both C.T. and S.L. testified under oath, and both were cross-examined by defense counsel. Judge Beistline did not err when he considered their testimony during sentencing.[128]

In his reply brief, Grandstaff argues that Judge Beistline's consideration of prior uncharged misconduct violates *Blakely v. Washington*[129] because the trial judge made this finding and not a jury. Because this argument is first raised in Grandstaff's reply brief, we will not address it in this appeal.[130] We ruled in *Walsh v. State*[131] that a defendant may proceed under Criminal Rule 35(a) to raise a claim that a sentence is illegal because of a violation of *Blakely*.[132]

■ Grandstaff argues that Judge Beistline's finding of statutory aggravating factor AS 12.55.155(c)(5) (Grandstaff knew or should have known that the victim was particularly vulnerable) as to Count 26, the first-degree sexual assault of S.Y., was contrary to AS 12.55.155(e). That statute provides that "[i]f a factor in aggravation is a necessary element of the present offense ... that factor may not be used to aggravate the presumptive term." Grandstaff bases his argument on Judge Beistline's comment during

---

127. See *Nukapigak v. State*, 562 P.2d 697, 701 (Alaska 1977), *aff'd on reh'g*, 576 P.2d 982, 984–85 (Alaska 1978).

128. *See id.*

129. 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

130. See *McCracken v. State*, 914 P.2d 893, 897 n. 1 (Alaska App.1996).

131. 134 P.3d 366 (Alaska App.2006).

132. *Id.* at 373–74.

sentencing that the victim's vulnerability is "an important part of the underlying crime."

But Judge Beistline's comment regarding a circumstance often present during a sexual assault does not alter the fact that the victim's vulnerability is not a necessary element of the offense of first-degree sexual assault. To prove first-degree sexual assault, the State must prove that the defendant knowingly engaged in sexual penetration while recklessly disregarding the victim's lack of consent to that penetration.[133] The victim's vulnerability is not a necessary element of first-degree sexual assault, nor was it included in the jury instruction for this count. Furthermore, even though Judge Beistline found aggravating factor (c)(5) and the parties stipulated to aggravating factor (c)(18)(B), Judge Beistline also found a mitigating factor and imposed a mitigated sentence, 5 years to serve with an additional 3 years suspended.

Grandstaff argues that it was an abuse of discretion for Judge Beistline to impose a 7-year term with 3 years suspended on Count 68, the second-degree sexual assault of S.P. But Grandstaff does not cite any authority for this argument. And it is not sufficient to note, as Grandstaff did, that the sentence for this count was almost as harsh as the sentence imposed for the first-degree sexual assault charge.

Ultimately, the issue we must consider when a defendant is sentenced for several crimes is not the individual sentence on each count. The starting point of the analysis in this circumstance is the presumptive term for the defendant's most serious crime—in this case, first-degree sexual assault, which had an 8–year presumptive term. That term is a benchmark that is not to be exceeded without "good reason."[134] Judge Beistline was aware of this case law. And he concluded that in Grandstaff's case, there were several good reasons to exceed that benchmark: Grandstaff's many convictions, the breach of

trust with his patients, and the need to protect the public.

Next, Grandstaff complains that Judge Beistline erroneously found that aggravating factor (c)(25) (Grandstaff's convictions involved large quantities of a controlled substance) applied to Grandstaff's convictions for misconduct involving a controlled substance. Judge Beistline based this finding on "the large number of transactions, the cumulative amount of drugs, and the extended period of time involved and also considering the fact that defendant was prescribing the drugs in order to control his patients and obtain sexual favors." For these same reasons, he rejected Grandstaff's proposed mitigators, (d)(9) (Grandstaff's conduct was the least serious within the definition of the offense) and (d)(14) (Grandstaff's convictions involved small quantities of a controlled substance).[135]

 Grandstaff argues that, because each prescription or delivery involved a small amount, the large quantity aggravating factor was unjustified. But the question of whether the amount of a controlled substance is large or small "must ... be resolved by the sentencing court as a factual matter, based on the totality of the evidence in the case and on the court's discretion, as informed by the totality of its experience."[136] Judge Beistline analyzed each class of Grandstaff's controlled substance convictions together and imposed concurrent terms for each class. As the record reveals, there were a large number of prescriptions and deliveries. And cumulatively, the amount of drugs was large and the prescriptions and deliveries occurred over a long time. Judge Beistline did not err when he found the large quantity aggravating factor.

Grandstaff further argues that the court should have found the least serious conduct mitigator, as the patients had real medical conditions for which they sought drugs and received drugs from other doctors. Again, Grandstaff offers no legal authority in support of his position. Moreover, regardless of

---

**133.** *See Reynolds v. State,* 664 P.2d 621, 623–25 (Alaska App.1983). *See also* AS 11.41.410(a).

**134.** *Farmer v. State,* 746 P.2d 1300, 1301 (Alaska App.1987).

**135.** AS 12.55.155(d)(9) and (14), respectively.

**136.** *Knight v. State,* 855 P.2d 1347, 1350 (Alaska App.1993).

the women's medical needs, Judge Beistline found that Grandstaff prescribed "the drugs in order to control his patients and obtain sexual favors." And in each count, the jury found that there was no medical purpose for the prescription or delivery of the controlled substances. These circumstances do not establish least serious conduct as a matter of law.

Judge Beistline imposed 3 years' imprisonment with 1 year suspended on each of the three second-degree theft counts and imposed the theft terms concurrently. These theft counts covered Medicaid funds expended for prescriptions and for appointments with Grandstaff. Grandstaff argues that this sentence was inappropriate for a first felony conviction, as the presumptive term for a second felony offender is 2 years. Grandstaff also contends that the sentence is excessive because the amount involved was "scarcely $5,000." Second-degree theft involves property valued at $500 to $25,000, and the composite total loss in this case was in excess of $5,000. But again, when a defendant is sentenced for multiple convictions, this court reviews the composite sentence as a whole.[137] Reviewing Grandstaff's sentence for the theft counts from this perspective, the composite 3-year sentence with 1 year suspended for three counts of second-degree theft is not excessive.

Finally, Grandstaff contends that his composite term is excessive. He notes that under *Farmer v. State*,[138] the sentencing court must have good reason for exceeding the presumptive term for the most serious offense.[139] In this case, Grandstaff's most serious offense is first-degree sexual assault, an unclassified felony with a presumptive 8-year term.[140] As we discussed above, Judge Beistline gave several reasons for imposing a sentence substantially longer than 8 years. He noted Grandstaff's many convictions, his abuse of his patients' trust, and the misuse of his medical privileges to satisfy his personal needs.

When we review a composite sentence imposed for several criminal convictions, we assess whether the defendant's combined sentence is clearly mistaken, given the whole of the defendant's conduct and history.[141] Grandstaff's composite 19-year sentence is a substantial period of imprisonment. But Grandstaff repeatedly abused his duty of care to his patients and manipulated their dependence on controlled substances for his personal sexual satisfaction. He manipulated the Medicaid program to pay for the victims' office visits and prescriptions. Grandstaff's misconduct spanned several years and involved multiple victims. Considering all of Grandstaff's misconduct and history, we conclude that the sentence imposed by Judge Beistline is not clearly mistaken.[142]

*Conclusion*

The judgment of the superior court is AFFIRMED.

**137.** *See Brown v. State*, 12 P.3d 201, 210 (Alaska App.2000).

**138.** 746 P.2d 1300.

**139.** *Id.*

**140.** AS 12.55.125(i)(1)(A).

**141.** *See Neal v. State*, 628 P.2d 19, 21 & n. 8 (Alaska 1981); *Comegys v. State*, 747 P.2d 554, 558–59 (Alaska App.1987).

**142.** *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974) (holding that an appellate court is to affirm a sentence unless the sentencing court's decision is clearly mistaken).