Jeffrey **GOTTLIEB**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. A–8350.

Court of Appeals of Alaska.

Jan. 25, 2008.

---

3. *See Love v. State,* 457 P.2d 622, 629–631 (Alaska 1969).

Gayle J. Brown, Anchorage, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

STEWART, Judge.

Jeffrey Gottlieb obtained a license to practice medicine in Alaska by misrepresenting his credentials. After practicing for several years, Gottlieb came to the attention of the Medicaid Fraud Control Unit of the Department of Law because of concerns that Gottlieb was overbilling Medicaid.

After an investigation, the grand jury indicted Gottlieb for perjury, forgery, eight counts of first-, second-, and fourth-degree theft; and two hundred and twenty-four counts of second- and third-degree misconduct involving a controlled substance.[1] The trial jury convicted Gottlieb on all counts.

Gottlieb raises several claims regarding his convictions, ranging from a statute of limitations issue to an attack on the jury instructions. For the reasons expressed below, we vacate Gottlieb's conviction for perjury, and reverse his convictions for forgery, two counts of first-degree theft, and one count of fourth-degree theft, and we affirm Gottlieb's remaining convictions.

*Facts and proceedings*

In an application endorsed under oath on June 3, 1992, Jeffrey Gottlieb applied to the State Medical Board for a license to practice medicine in Alaska. One of the questions on the license application required Gottlieb to declare where he had completed his post-graduate internship, also called a post-graduate year one, which is required when applying for a medical license. Gottlieb answered that he had completed post-graduate year

one at Monsour Medical Center in Pennsylvania.

The State Medical Board issued Gottlieb a license based on his answer to the above question together with several documents that Gottlieb supplied in support of his application. In November 1993, Gottlieb began practicing medicine in Alaska.

In the fall of 1997, the Alaska Medicaid Fraud Control Unit began investigating Gottlieb for overbilling Medicaid. As a result of the investigation, a search warrant was executed on Gottlieb's apartment, which doubled as his office. The Fraud Unit seized documents recording his treatment of patients. The Fraud Unit's investigation revealed that, although Gottlieb had participated in Monsour Medical Center's postgraduate medical program, he had not satisfactorily completed the post-graduate year one requirements. Ultimately, the case proceeded through indictment and Gottlieb was convicted at trial.

Superior Court Judge Elaine M. Andrews sentenced Gottlieb to concurrent terms of 10 years' imprisonment with 3 years suspended on the perjury, forgery, first- and second-degree theft counts, and second-degree misconduct involving controlled substance counts. Gottlieb received lesser concurrent terms on the remaining counts. Gottlieb appeals.

*Discussion*

*Gottlieb's claim that the statute of limitations bars the perjury charge*

Gottlieb argues on appeal that the statute of limitations barred the State from prosecuting him on the perjury charge. The grand jury charged that Gottlieb committed perjury by knowingly and falsely claiming to have completed post-graduate year one on the notarized application for a license that he submitted to the State Medical Board on June 3, 1992. The grand jury returned the indictment on April 27, 2000—almost eight years

---

1. AS 11.56.200(a), AS 11.46.505(a)(1), AS 11.46.120, AS 11.46.130, AS 11.46.150, and AS 11.71.030(a)(2), respectively.

after the act for which he was indicted. Gottlieb raises this claim for the first time on appeal.

In *Padie v. State*,[2] the Alaska Supreme Court addressed the question whether the statute of limitations was an affirmative defense that must be asserted in the trial court or lost, or alternatively, that compliance with the statute of limitations was a jurisdictional issue that could be raised for the first time on appeal.[3] The court resolved this issue as follows: "In our view, the arbitrary jurisdictional-affirmative defense distinction should be abandoned in favor of a case-by-case analysis focusing on the language of the applicable statute of limitations and the public policies behind its enactment."[4]

The State had charged Padie with first-degree murder, which was not time-barred, but reached an agreement that permitted Padie to plead no contest to manslaughter even though prosecution for manslaughter was otherwise time-barred.[5] The supreme court held that the statute of limitations could be waived by a defendant if: the waiver was knowingly, intelligently, and voluntarily entered; the waiver was made for the defendant's benefit and after consultation with counsel; and the waiver did not contravene the policy reasons underlying the statute of limitations.[6]

The normal statute of limitations for prosecuting crimes is five years.[7] If the crime involves a "material element of fraud," AS 12.10.020(a) extends the general time limitation for up to three additional years. However, if the State relies on this statutory extension, the prosecution must commence "within one year after the discovery of the

offense by an aggrieved party[.]"[8] In this case, prosecution of the perjury charge commenced when the indictment was returned on April 27, 2000.[9]

■ The State argues that perjury is a crime that involves a "material element of fraud" and, furthermore, that the State commenced prosecution of this crime within one year of discovering that Gottlieb's conduct constituted perjury.

In an unreported case, *Latchem v. State*,[10] we addressed whether the crime of making a campaign contribution in another person's name [11] contained a material element of fraud for purposes of triggering the one-year period for commencing prosecution under AS 12.10.020(a). We suggested in *Latchem* that the application of AS 12.10.020(a) depends on the material elements of the crime, not on the defendant's motivation for committing the crime.[12]

There is no specific definition of "fraud" as that term is used in AS 12.10.020(a). The State points out that, for purposes of the property crimes chapter of Title 11, an "intent to defraud" means an "intent to use deception."[13] Black's Law Dictionary defines "fraud" as "a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment."[14]

But even if we assume that the crime of perjury requires the State to prove a material element of fraud, the State must still show that Gottlieb was prosecuted within one year of the discovery of the offense. The Fraud Unit first learned of potential Medicaid billing problems associated with Gottlieb on

2. 594 P.2d 50 (Alaska 1979).

3. *Id.* at 55–57.

4. *Id.* at 57.

5. *Id.* at 54.

6. *Id.* at 57.

7. AS 12.10.010.

8. AS 12.10.020(a).

9. AS 12.10.030(b).

10. Alaska App. Memorandum Opinion and Judgment No. 4084 (August 4, 1999), 1999 WL 587238.

11. *See* former AS 15.13.070(d), recodified as AS 15.13.074(b).

12. *Latchem*, Memorandum Opinion and Judgment No. 4084 at 6, 1999 WL 587238 at *3.

13. *See* AS 11.46.990(11)(A).

14. BLACK'S LAW DICTIONARY 685 (8th ed.2004).

September 24, 1997, and began investigating shortly thereafter. In September 1998, the State obtained and executed a search warrant for Gottlieb and his residence. In March 1999, the Fraud Unit asked its Pennsylvania counterpart for assistance in obtaining evidence from Monsour Medical Center. Fraud Unit Investigator Sharon Magier sent an affidavit, dated April 12, 1999, to Don Wojtowich, a special agent in the Pennsylvania Attorney General's Office. The affidavit was sent to support the application for a search warrant in Pennsylvania. Wojtowich obtained a search warrant based on Magier's affidavit on May 4, 1999, and executed the warrant the following day at the Monsour Medical Center. Gottlieb's complete personnel file was seized. The documents reflected Gottlieb's failure to complete his internship.

The State argues that, for purposes of AS 12.10.020(a), a criminal offense is not discovered until the State has probable cause to believe that the defendant committed the offense. But even assuming this is correct, the perjury prosecution against Gottlieb was time-barred.

The State maintains it did not have probable cause to believe Gottlieb committed perjury until a search warrant for Gottlieb's records at the Monsour Medical Center was executed in Pennsylvania on May 5, 1999. Gottlieb points out that the State certainly knew by March 1999 that the Monsour Medical Center had not issued Gottlieb an internship certificate (technically known as a PGY–1). The State had received a letter from the hospital's attorney in March 1999 confirming that Gottlieb had not received a certificate for completing a year of postgraduate training and had not completed his required rotations. The Fraud Unit investigator then decided to obtain the hospital's original records and contacted the Pennsylvania authorities for assistance with obtaining a search warrant for the records. And earlier, in September 1998, the State had seized documents from Gottlieb's residence that reflected Gottlieb's failure to complete his internship.

The search warrant for Gottlieb's personnel file executed in Pennsylvania on May 5, 1999, was supported by the April 12, 1999, affidavit from the Fraud Unit investigator. The search warrant sought the original records reflecting that Gottlieb had not completed his internship. It follows that the State had evidence demonstrating a "fair probability or substantial chance"[15] that Gottlieb committed perjury by the end of March 1999, and no later than April 12, 1999. The indictment was returned April 28, 2000, more than one year later. Therefore, the perjury prosecution was not commenced within one year of its discovery. Accordingly, we conclude that Gottlieb's perjury prosecution is time-barred and his perjury conviction must be vacated.

*Gottlieb's attack on the forgery conviction*

Next, we address Gottlieb's attack on his forgery conviction. Gottlieb argues that the State did not present sufficient evidence of a "forged instrument" to sustain his conviction. Gottlieb was convicted of second-degree forgery under AS 11.46.505(a)(1). Alaska Statute 11.46.505(a) provides:

A person commits the crime of forgery in the second degree if he violates § 510 of this chapter and the instrument is or purports to be

(1) a deed, will, codicil, contract, assignment, negotiable or other commercial instrument, or other document which does or may evidence, create, transfer, alter, terminate, or otherwise affect a legal right, interest, obligation, or status; or

(2) a public record.

Alaska Statute 11.46.510(a) defines forgery in the third degree as follows:

A person commits the crime of forgery in the third degree if, with intent to defraud, the person

(1) falsely makes, completes, or alters a written instrument;

(2) knowingly possesses a forged instrument; or

15. *State v. Joubert,* 20 P.3d 1115, 1119 (Alaska 2001) (quoting *Van Sandt v. Brown,* 944 P.2d 449, 452 (Alaska 1997)).

(3) knowingly utters a forged instrument.

In AS 11.46.580(b)(3), the code defines "written instrument" to mean:

[A] paper, document, instrument, electronic recording, or article containing written or printed matter or the equivalent, whether complete or incomplete, used for the purpose of reciting, embodying, conveying, or recording information or constituting a symbol or evidence of value, right, privilege, or identification, which is capable of being used to the advantage or disadvantage of some person.

The State charged Gottlieb with forgery based on the assertion that he submitted an application for a license to practice medicine that contained false statements. But such conduct does not constitute forgery unless the false statements are designed to misrepresent the true identity of the person who prepared the application.

"Forged instrument" is defined in AS 11.46.580(b)(1) as "a written instrument which has been falsely made, completed, or altered[.]" Alaska Statute 11.46.580(a) defines what it means to falsely "make," "complete," and "alter," a written instrument. To "falsely alter" a written instrument means to change it "so that the instrument so altered falsely appears or purports to be in all respects an authentic creation of its ostensible maker[.]" [16] To "falsely complete" a written instrument means to complete an incomplete written instrument "so that the complete written instrument falsely appears or purports to be in all respects an authentic creation of its ostensible maker[.]" [17] To "falsely make" a written instrument means to create "a complete or incomplete written instrument that purports to be an authentic creation of its ostensible maker, but which is not[.]" [18]

In other words, an instrument or document is "forged" only if it is altered, completed, or otherwise created so as to falsely appear or purport to be an authentic creation of someone other than its true maker. The State concedes that Gottlieb prepared and submitted the medical license application, and that none of the statements in the application suggests otherwise. The State has never asserted that the document falsely appears to be an authentic creation of Gottlieb's. Thus, even though the document contained false assertions of fact, those false assertions did not misrepresent the identity of the person who prepared the document. Instead, the forgery charge was based on the State's assertion that the document contained false assertions of fact.

The State now argues that there was evidence in the record that Gottlieb falsely altered a letter that was submitted in support of his application. But at Gottlieb's trial, the prosecutor never claimed that this altered letter established the forgery charge. Rather, the prosecutor argued that the application itself constituted the forgery. The prosecutor argued that Gottlieb committed forgery when he submitted the application that answered the question "where did you complete your training?" with the answer "the Monsour Medical Center."

> *Prosecutor:* [E]ven though [Gottlieb] knew better [than to claim that he completed his training at Monsour], he signed that application under oath. That ladies and gentlemen is perjury and forgery, counts one and two. Perjury is the lying under oath, count two forgery is submitting the false document to the medical board.

Because there is no evidence in the record that Gottlieb "falsely altered, completed, or made" the application he submitted for his medical license, Gottlieb's conviction for forgery must be reversed.

*Gottlieb's attack on the fourth-degree theft convictions*

The grand jury indicted Gottlieb in counts 9 and 10 of the indictment for two counts of fourth-degree theft. A person commits theft when, with intent to deprive another of property or to appropriate the property of another for himself, the person unlawfully obtains

---

**16.** AS 11.46.580(a)(1).

**17.** AS 11.46.580(a)(2).

**18.** AS 11.46.580(a)(3).

the property of another.[19] Fourth-degree theft is defined as a theft valued at less than $50.[20]

In count 9, the grand jury charged Gottlieb with taking sample medications from Urgent Care Medical Clinic in Anchorage on June 14, 1998, when Gottlieb was filling in for the regular doctor who was on vacation. Gottlieb asked Tonya Dedomenici, a medical assistant at the clinic, if he could have some sample medications. At trial, Dedomenici testified that Gottlieb "asked me if he could have um, some sample medications and I told him uh, he could." At that point, Gottlieb took "a couple" trash bags—the "white kitchen" type trash bags—from the clinic; opened the boxes containing the sample medications; threw away the warnings contained in the boxes; and placed the medications in the trash bags.

Dedominici testified that she had thought that Gottlieb was experiencing discomfort from a cold or a headache and that he wanted to use a small dose of cold or headache medicine to treat the symptoms he was personally experiencing. Dedominici explained that, when clinic employees had a cold or a headache, they regularly treated their cold symptoms or headache with sample medication from the clinic, and that clinic employees were welcome to do so. But Dedominici testified that Gottlieb appropriated from the medicine cabinet a large volume (two kitchen trash bags full) of a variety of medications.

Dedominici also testified that when Gottlieb had finished taking samples, there "wasn't very much" left in the medicine cabinet, and that she "was a little surprised" by how many sample medications Gottlieb had taken. Gottlieb told her that he was taking the samples because he treated patients out of his house and drug company representatives did not give him samples like they did for the clinic.

When asked why she had not stopped Gottlieb from taking so many sample medications, Dedominici testified that she was not a confrontational person. Dedominici thought that Gottlieb was asking only to "swallow[ ] a pill or something," "on the spot," to treat a cold or a headache. And she explained that, although she "didn't think it was right" for Gottlieb to take so many sample medications, she did not want to stop Gottlieb because she was six months pregnant at the time.

Gottlieb argues that there was insufficient evidence to convict him of theft for taking the samples. He points out that he was given permission to take the samples. The State counters that Gottlieb took more than Dedominici expected he would. But Dedominici did not express or communicate any of the reservations she had about the number of samples Gottlieb took. Viewing the evidence in the light most favorable to the State, we conclude that Gottlieb's conduct in taking the drug samples, with the express permission of a regular member of the clinic staff, did not constitute theft. Accordingly, a judgment of acquittal must enter on that count.

We reach a contrary result on count 10, a charge of fourth-degree theft for taking drug samples from the Chugach Family Medical Clinic between August 7 and August 16, 1996. At the time, Gottlieb was filling in for a staff doctor who was on vacation.

Gottlieb argues that insufficient evidence supported his conviction on this charge because the State failed to present testimony from a witness who observed Gottlieb take sample medications. But the State presented circumstantial evidence of theft.

Rosalie Stofflet, the laboratory supervisor at the clinic during the time of the offense, testified that the clinic stored a great deal of sample medications in a small store room. Based on the quantity of samples that were missing after Gottlieb stopped working at the clinic, she believed that Gottlieb had taken a significant amount of samples from the clinic. Stofflet testified that it was "very obvious" that samples were missing from the shelves because drug company representatives kept the clinic well-supplied with samples, and the shelves were full of sample medications from floor to ceiling along one side of the store

---

19. AS 11.46.100(1).

20. AS 11.46.150.

room. Finally, Stofflet testified that she had not given Gottlieb permission to take any samples from the clinic.

Viewed in the light most favorable to sustaining the conviction, we conclude that this quantum of circumstantial evidence is sufficient to sustain this conviction for fourth-degree theft.

*The attack on the jury instructions for controlled substances misconduct*

■ Gottlieb argues that the superior court erred in the jury instructions that related to the counts charging him with misconduct involving a controlled substance. The State charged Gottlieb with more than two hundred counts of misconduct involving a controlled substance for issuing prescriptions from 1996 through 1999.

The jury instructions provided that the State had to prove that Gottlieb knowingly and unlawfully delivered controlled substances as specified in each count. The court instructed the jury that for each count of misconduct involving a controlled substance, the prescriptions for controlled substances issued by Gottlieb were unlawful "if there did not exist a legitimate medical purpose for them."

The court defined "legitimate medical purpose" as follows:

> A legitimate medical purpose in this context existed if each of the following was present: (1) the defendant's sole purpose in issuing the prescription(s) was medical as opposed to any other purpose, (2) the prescription(s) was reasonably necessary for treatment of a person's illness or injury, and, (3) the prescription(s) was issued by the defendant while acting within the usual course of professional medical practice and in accordance with a standard of medical care generally recognized and accepted within the medical community.

Gottlieb argues that this instruction was erroneous. Specifically, Gottlieb argues that the instruction improperly allowed the jury

to convict him of incompetently prescribing drugs because the instruction allowed the jury to convict him if he prescribed drugs while not "acting within the usual course of professional medical practice and in accordance with a standard of medical care generally recognized and accepted within the medical community."

We recently addressed these same claims in *Grandstaff v. State*.[21] In *Grandstaff*, the defendant was also convicted of numerous counts of unlawfully distributing controlled substances by writing prescriptions that served no medical purpose. Like Gottlieb, Grandstaff argued that the superior court's instructions to the jury erroneously allowed the jury to convict him of those offenses if the State proved that his decision to write the prescriptions fell below the standard of practice "generally recognized and adopted within the medical community," even if he honestly believed there was a medical purpose for writing the prescriptions.[22] In other words, Grandstaff argued that the instructions allowed the jury to convict him for medical malpractice. He also argued that the instructions allowed the jury to convict him if he had some non-medical purpose for prescribing the drugs, even if he also had a proper medical purpose.[23]

In *Grandstaff*, we acknowledged that the instruction defining "legitimate medical purpose" in terms of the standard of practice generally accepted in the medical community, considered in isolation, potentially violated due process by allowing the jury to convict the defendant of a criminal offense for providing negligent medical care.[24] We also acknowledged that a jury instruction that allowed the jury to convict the defendant if he had any non-medical purpose for writing a prescription—even if he also had a medical purpose—might also violate due process.[25] We noted, for instance, that it would be unconscionable to convict a doctor for prescribing a medication for valid medical reasons just because the doctor also hoped that

**21.** 171 P.3d 1176 (Alaska App.2007).

**22.** *Grandstaff,* 171 P.3d at 1208.

**23.** *Id.*

**24.** *Id.*

**25.** *Id.*

the success of his treatment decisions would improve his reputation and allow his practice to grow.[26]

But we found no error in Grandstaff's case because the instruction defining the elements of the charged offenses of misconduct involving a controlled substance required the State to prove beyond a reasonable doubt that Grandstaff recklessly disregarded the fact that the prescriptions he wrote served no legitimate medical purpose. As we explained, "the elements instruction required the State to prove that there was *no* valid medical purpose for writing the prescriptions—and that Grandstaff knew of, or was at least reckless concerning, this circumstance." [27]

Unlike the jury in *Grandstaff*, the jury in this case was not instructed that the State had to prove that Gottlieb recklessly disregarded the fact that the prescriptions he issued served no medical purpose. The jury was instructed that a prescription did not serve a "legitimate medical purpose" unless the defendant's "sole purpose in issuing the prescription(s) was medical as opposed to any other purpose." Theoretically, a jury receiving this instruction might convict a prescribing physician if the physician was negligent in issuing prescriptions or if the physician had both medical and non-medical reasons for writing the prescriptions.

But the State did not argue that Gottlieb was merely negligent in writing the prescriptions, or that Gottlieb should be convicted because he had some other purpose in addition to a medical purpose when he issued the prescriptions. Instead, the prosecutor announced in opening statement that the case against Gottlieb for the controlled substances counts relied on evidence that the prescriptions those counts were based on were issued "in the absence of any medical necessity," and that Gottlieb was running a "pill mill," a scheme to provide drug seeking individuals with drugs for their own use or for resale on

the street. In final argument, the prosecutor repeatedly argued that Gottlieb issued all the prescriptions relevant to this case "without any medical necessity," and thereafter summarized the evidence supporting that theory of prosecution.

■ This issue is presented to us as one of plain error because Gottlieb did not object to the pertinent jury instructions. To constitute plain error, an erroneous instruction must create "a high likelihood that the jury followed an erroneous theory[,] resulting in a miscarriage of justice." [28]

The State's theory of prosecution for the counts of misconduct involving a controlled substance was that Gottlieb issued prescriptions to drug-dependent individuals not to treat their medical conditions, but to supply them with drugs they were seeking. The evidence presented by the State supported that theory. Our review of the record convinces us that the jury did not follow an erroneous theory leading to a miscarriage of justice.

*The State's attack on the validity of Gottlieb's medical license*

■ The State's theory of the case for two first-degree theft counts was that the State Medical Board should not have issued a medical license to Gottlieb. Besides charging Gottlieb with perjury and forgery in the application process, the State premised its prosecution on the first-degree theft charges in counts 5 and 6 on its assertion that the license issued by the State Medical Board was invalid. The State argued that, because Gottlieb was paid for medical services that he performed under authority of the invalid license, Gottlieb's conduct was theft.

Under the Alaska Statutes, the State Medical Board has the exclusive authority to issue medical licenses.[29] The statutory scheme creating the Medical Board also specifies the grounds for imposing disciplin-

---

26. *Id.*

27. *Id.* (emphasis added).

28. *E.g., Matter of Estate of McCoy,* 844 P.2d 1131, 1134 (Alaska 1993); *Heaps v. State,* 30 P.3d 109, 114 (Alaska App.2001).

29. AS 08.64.101 (requiring the Board to admit, license, and discipline physicians); AS 08.64.170 (mandating that all Alaska physicians be licensed by the Board).

ary sanctions and includes the specific ground of obtaining a license by "deceit, fraud, or intentional misrepresentation." [30] If the Board finds that a licensee has committed one (or more) of the grounds for imposition of a sanction, the Board is authorized to impose a wide range of disciplinary sanctions including permanently revoking a license.[31]

In the superior court, Gottlieb argued that, under *Taylor v. Johnston*,[32] the State could not contest the validity of Gottlieb's license in the criminal case. The superior court denied Gottlieb relief on this theory. Gottlieb raises this issue on appeal, again relying on *Taylor*. The State does not discuss *Taylor* in its brief.

In *Taylor*, the plaintiff attempted to amend his medical malpractice complaint before trial to allege a claim of medical battery.[33] Taylor argued that a medical battery claim was possible because the treating physician whom he was suing had fraudulently obtained his medical license by misrepresenting his credentials.[34] But the supreme court recognized the Board's exclusive authority to regulate medical licenses and the wisdom of that delegation: "Such a delegation makes sense because '[m]edicine is a complex subject and ... [t]he Board is a competent body equipped with the necessary medical knowledge to determine whether a doctor's license to practice should be revoked.'"[35] Because the Board had the exclusive authority to regulate the physician's license, the supreme court reasoned that the proper forum in which to attack the validity of the physician's license, in the first instance, was the Medical Board, not the superior court.[36]

We conclude that this same analysis applies here. The proper forum to attack the validity of Gottlieb's license was in the State Medical Board. Accordingly, we reverse counts 5 and 6.

*Gottlieb's remaining claims*

Gottlieb argues that there is insufficient evidence in the record to support his convictions for first-degree theft in counts 3 and 4, and second-degree theft in counts 7 and 8. Count 3 charged that Gottlieb overbilled Medicaid by more than $75,000 by "upcoding" the procedures for which he billed. ("Upcoding" means assigning a billing code that reflects a more intensive or complicated procedure calling for higher payment than the procedure performed.) Count 4 charged that Gottlieb stole more than $30,000 by billing for services not performed or documented. Count 7 charged that Gottlieb stole more than $5,000 for other upcoding. Count 8 charged theft of more than $14,000 based on the payment for Gottlieb's unwarranted prescriptions.

Viewing the evidence in the record, together with the reasonable inferences from that evidence, in the light most favorable to upholding those convictions, we conclude that there was sufficient evidence presented for a reasonable juror to conclude that the State had proven those counts beyond a reasonable doubt.[37]

*Conclusion*

We VACATE Gottlieb's conviction on count 1. We REVERSE Gottlieb's convictions on counts 2, 5, 6, and 9. We AFFIRM Gottlieb's convictions on counts 3, 4, 7, 8, and 10, and on the counts of misconduct involving a controlled substance.

**30.** AS 08.64.326(a)(1).

**31.** AS 08.64.331.

**32.** 985 P.2d 460 (Alaska 1999).

**33.** *Id.* at 461.

**34.** *Id.* at 463–464.

**35.** *Id.* at 465 (quoting *Storrs v. State Med. Bd.*, 664 P.2d 547, 554 (Alaska 1983)).

**36.** *Id.*

**37.** *See Dorman v. State*, 622 P.2d 448, 453 (Alaska 1981).